# United States Court of Appeals
## For the First Circuit

No. 03-1087

UNITED STATES OF AMERICA,

Appellee,

v.

OMAR GRACE,

Defendant-Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. George Z. Singal, Chief U.S. District Judge]

Before

Lynch, Circuit Judge,
Stahl, Senior Circuit Judge,
and Lipez, Circuit Judge.

Cynthia A. Vincent, with whom Thomas and Thomas, Attys. was on the brief, for Appellant.

Margaret D. McGaughey, Appellate Chief, with whom Paula D. Silsby, U.S. Attorney, was on the brief, for Appellee.

May 7, 2004

**LIPEZ**, <u>Circuit Judge</u>.  In this criminal appeal, we conclude that the district court supportably found that the defendant's possession of a firearm to protect her drugs and proceeds of drug sales satisfied the nexus requirement in 18 U.S.C. § 924(c), which punishes possession of a firearm "in furtherance of" a drug trafficking offense.  We also resolve an unresolved question about the consequences for a defendant making a sufficiency of the evidence attack on appeal who, in a jury-waived trial, failed to make a motion for a judgment of acquittal under Fed. R. Crim P. 29.

## I.

We draw the historical facts from the trial transcript and present them in the light most favorable to the judgment of the court in this jury-waived trial.  <u>United States</u> v. <u>Zenon-Rodriguez</u>, 289 F.3d 28, 29 (1st Cir.), <u>cert denied</u>, 537 U.S. 886 (2002).  Defendant-appellant Omar Grace dealt Oyxcontin (oxycodone) and cocaine from her single-family house in Exeter, Maine for approximately twelve to eighteen months.  She acquired the drugs from a local drug courier named Harold Hawks, a longtime friend named Michelle Landry, and members of a motorcycle gang called The Iron Horsemen.  These individuals delivered the drugs to Grace's house and then returned some time later to pick up their share of the proceeds.  Grace conducted the sales in her kitchen and stored the drugs and the proceeds in her computer room, which was

-2-

separated from her bedroom with a curtain and connected to her kitchen through a large, open doorway. She sold approximately $1,000 to $4,000 worth of drugs per week in this manner.[1]

State and local police executed a search warrant at Grace's home on November 14, 2001. The officers found cocaine, Oxycontin, drug ledgers, and $2,585 in drug proceeds in her computer room. They also found electronic scales and a .38 caliber handgun in her bedroom. The handgun was found unloaded in a plastic bag in a drawer under her bed. The drawer was blocked by a duffel bag, a trash can, and a box of books. The police did not find any ammunition in the house.

On February 12, 2002, a federal grand jury in Maine returned a seven count indictment against Grace. The indictment consisted of two counts of possession and distribution of oxycodone, two counts of possession and distribution of cocaine, one count of conspiracy to possess and distribute cocaine and oxycodone, one count of possession of a firearm in furtherance of a drug trafficking offense, and a civil forfeiture count that required her to turn over at least $2,585 in drug proceeds. Grace pled not guilty to all counts at her arraignment on March 8, 2002,

---

[1]Grace testified that she averaged approximately $2,000 to $3,000 in drug sales every week to two weeks but also noted that she sold approximately $100,000 worth of drugs in the six months prior to her arrest.

and the district court released her on bond with several conditions, including that she submit to random urine testing.

On August 21, 2002, the government moved to revoke Grace's bail because two of her drug screens indicated that she had used cocaine. Although she denied having used the drug and signed an affidavit to that effect, the government presented laboratory tests confirming one of the positive screens. The other screen was determined to have been a false positive. Since Grace violated the terms of her release and since it did not appear that the government would be able to ensure that she did not continue to violate those terms, the district court revoked her bail.

On October 7, 2002, the district court held a Rule 11 hearing where Grace pled guilty to the drug distribution charges and stipulated to the civil forfeiture. She pled not guilty to the firearm charge, waived her right to a jury trial, and was tried and convicted by the district court on October 9, 2002.

The evidence presented to the court during Grace's trial consisted primarily of the testimony of four individuals: two police officers and one customs agent testified for the government, and Grace alone testified for the defense. Detective William Flagg of the Penobscot County Sheriff's Office, describing the search of Grace's house, testified that he had not observed anything "of value" in the house other than the drugs and drug proceeds. The government introduced the recovered handgun as evidence during his

testimony, and the parties stipulated that it "function[ed] as designed."

Special Agent Ruth Duquette of the Maine Drug Enforcement Administration, testifying about an interview she conducted with Grace three days after the police searched her house, said that Grace appeared tired but "fine" as she told Duquette about her drug dealing activities and the handgun. Grace's home had been burglarized twice. The thieves stole drugs in the first robbery and $5,000 in collectible coins in the second robbery. Duquette testified that Grace told her "that they had the firearm [in the house] because they had been robbed two times." On cross-examination, Grace's attorney asked Duquette: "So, in essence, she told you that she purchased this firearm for protection because of these prior break-ins; is that correct?" Duquette answered: "Correct." Grace suspected that one of her drug sources, Harold Hawks, committed the second robbery because Hawks' brother later showed her one of the stolen coins.

Special Agent Phillip Riherd of the United States Customs Service, who was also present at Grace's police interview, reiterated Duquette's assertion that Grace said that thieves stole drugs in the first robbery, and added that "[s]he said she had been robbed on two occasions, and that's the reason why she had the gun."

Grace insisted in her testimony that her purchase of the gun had nothing to do with her drug trafficking. Her husband was rarely home and she was nervous about living alone "in the country" with her sixteen year old daughter, especially after the two break-ins. She purchased the gun from her friend and drug source, Michelle Landry, for "protection." This was the first gun that she had possessed since she got rid of her .22 hunting rifle eight to ten years earlier. Grace kept the .38 under the bed because it jammed soon after she purchased it when she and her friends shot a box of ammunition in her friend's backyard. Although she asked some other friends to help her to fix the gun and left it with a repairman for approximately six weeks, she eventually concluded that it was irreparable. Although Landry promised to return her money, they could not "connect to get things swapped back around"; therefore, she stored the gun under the bed and never removed it. She could not explain why the police were able to test fire the weapon when they seized it. When the government asked her whether she was as concerned about the need for protection at the time of her arrest as she was when she purchased the gun, she replied: "Yes [I] was."[2]

_____

[2]Both the government and Grace's attorney asked her why she purchased the gun. When her attorney asked her whether she went out and looked for a gun or just heard that Landry had one, Grace said: "I think it was just we was talking about the fact that [my husband] was gone, and Misty and I were home alone a lot, and that we'd got broken into one night when I was working at the convenience store in Corinna, and I started thinking about getting

Although Grace denied that she told the police that thieves stole drugs during the first robbery, she admitted that they stole collectible coins and a strongbox containing her important papers during the second robbery. She also admitted that the only area that the thieves disturbed in the second robbery was the area in which she stored her drugs and drug proceeds. She did not report either robbery to the police.

After deliberating for approximately one hour, the district court found Grace guilty of possession of a firearm in furtherance of a drug crime. It sentenced her to 130 months of imprisonment, seventy months for the drug crimes to which she pled guilty and a mandatory minimum consecutive sentence of sixty months for the firearm conviction.

---

a gun for protection where Don was gone and we was home alone so much." Later, Grace and her attorney engaged in a colloquy regarding the connection between the break-ins and the gun:

> Attorney: "Now you've talked about getting [the gun] for self-protection purposes?"
> Grace: Yes.
> Attorney: Because of prior break-ins?
> Grace: Yes.

The government also asked her about the circumstances surrounding her purchase of the gun:

> Government: Ms. Grace, it's fair to say, and if I understand you correct, is it not, that the reason you got the gun was for protection?
> Grace: Yes.
> Government: That's the sole reason you got the gun?
> Grace: Yes.

## II.

Grace claims that the government failed to present sufficient evidence to prove that there was a nexus between her firearm and her drug trafficking. The government claims that since she failed to raise this sufficiency issue below with a Fed. R. Crim. P. 29 motion,[3] we should review her claim only for "clear and gross injustice." Grace responds that she did not have to make such a motion for acquittal during a bench trial to preserve the normal de novo standard of review for sufficiency of the evidence claims, often stated as follows: "[W]hether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Casas, 356 F.3d 104, 126 (1st Cir. 2004) (internal quotation marks omitted). We must resolve this conflict before we consider the substance of Grace's claim.

---

[3]Rule 29 provides, in pertinent part:
After the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction. The court may on its own consider whether the evidence is insufficient to sustain a conviction. If the court denies a motion for a judgment of acquittal at the close of the government's evidence, the defendant may offer evidence without having reserved the right to do so.
Fed. R. Crim. P. 29(a).

## A.  Standard of Review

The government states that "neither [its] research nor Grace's reveals any authority from this circuit that decides the issue of whether a Rule 29 motion is also required to preserve a sufficiency-of-the-evidence attack on appeal from a bench trial." We agree that we have not squarely addressed this issue before. The government argues that we should apply a deferential standard of review rather than de novo review in these circumstances.

Rule 29 protects a defendant "against an improper or irrational verdict of the jury.  In other words, Rule 29 takes cognizance of the reality that jurors may not always be capable of applying strictly the instructions of the court, or of basing their verdict entirely on the evidence developed at the trial."  Moore's Federal Practice § 629.02[4] (3d ed. 2002); see also 2A Charles Allen Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure § 461 (2000) (stating that Rule 29 vests judges with the responsibility of directing a not guilty verdict when the facts are so clear as to create a "risk that a jury may capriciously find [the defendant] guilty though there is no legally sufficient evidence of guilt").  It is odd to suggest that trial judges must be given the opportunity with a Rule 29 motion to protect themselves from their own capriciousness.

As the commentators note, "Rule 29 has no real application when a case is tried by the court since the plea of not

guilty asks the court for a judgment of acquittal." Moore's Federal Practice § 629.02[3] (3d ed. 2002). A plea of not guilty is the "functional equivalent" of a Rule 29 motion in a bench trial. United States v. Atkinson, 990 F.2d 501, 503 (9th Cir. 1993) (en banc); see also Hall v. United States, 286 F.2d 676, 677 (5th Cir. 1961) ("The plea of not guilty asks the court for a judgment of acquittal, and a motion to the same end is not necessary."). The district court must conduct the same analysis of the law and the evidence whether it evaluates a motion for acquittal under Rule 29 or adjudicates a not guilty plea. Compare Fed. R. Crim P. 29(a) ("[T]he court . . . must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."), with In re Winship, 397 U.S. 358, 364 (1970) ("[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.").

Therefore, we join the circuits that have ruled that a defendant does not have to make a Rule 29 motion in a bench trial to preserve the usual standard of review for a sufficiency of the evidence claim on appeal. See, e.g., United States v. Hogan, 89 F.3d 403, 404 (7th Cir. 1996); Atkinson, 990 F.2d at 503 (9th Cir. 1993); United States v. Besase, 373 F.2d 120, 121 (6th Cir. 1967); United States v. Whitlock, 663 F.2d 1094, 1097 n.24 (D.C. Cir. 1980) (opinion of Robinson, J.); Hall, 286 F.2d at 677.

Accordingly, we will review Grace's claim de novo, evaluating "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. We draw all reasonable evidentiary inferences in harmony with the verdict and resolve all issues of credibility in the light most favorable to the government." Casas, 356 F.3d at 126 (internal quotation marks and citations omitted).

## B. Grace's Sufficiency of the Evidence Claim

In 1998, Congress amended 18 U.S.C. § 924(c)(1)(A) to preserve a mandatory minimum consecutive sentence for "any person who, during and in relation to any crime of violence or drug trafficking crime . . . for which the person may be prosecuted in a court of the United States, . . . in furtherance of any such crime, possesses a firearm . . . ." Pub. L. 105-386, 112 Stat. 3469 (1998) (codified at 18 U.S.C. § 924(c)(1)(A)). This amendment responded to Bailey v. United States, 516 U.S. 137, 150 (1995), in which the Supreme Court held that under the prior version of the statute, "the Government must show that the defendant actively employed the firearm during and in relation to the predicate crime."[4] The current version of the statute, therefore, does not

---

[4]The version of the statute that the Court evaluated in Bailey established a mandatory minimum five year consecutive sentence for any person who "during and in relation to any . . . drug trafficking crime . . . for which he may be prosecuted in a court of the United States, uses or carries a firearm." 18 U.S.C.

-11-

require defendants to have actively employed the firearm in furtherance of the drug crime; however, they must have possessed the gun to further the drug crime:

> The government must clearly show that a firearm was possessed to advance or promote the commission of the underlying offense. The mere presence of a firearm in an area where a criminal act occurs is not a sufficient basis for imposing this particular mandatory sentence. Rather, the government must illustrate through specific facts, which tie the defendant to the firearm, that the firearm was possessed to advance or promote the criminal activity.

United States v. Lawrence, 308 F.3d 623, 630 (6th Cir. 2002) (quoting H.R. Rep. No. 105-344, at 12); see also United States v. Carlos Cruz, 352 F.3d 499, 509 (1st Cir. 2003) ("[M]erely determining that [the defendant] was in possession of a sidearm is not enough to support the conviction; we must also consider whether the weapon was possessed 'in furtherance of . . . a drug-trafficking crime.'") (emphasis in original).

In United States v. Luciano, 329 F.3d 1 (1st Cir. 2003), we concluded that a defendant's possession of a firearm to protect drugs and drug proceeds provides the required nexus between the drugs and the firearm. We relied on evidence that the defendant stored firearms in a crawlspace with heroin to conclude that he used those firearms to protect the drugs, and that this evidence

---

§924(c)(1) (1997) (emphasis added).

provided a sufficient basis to trigger section 924 liability.  Id.

at 6.    Similarly, in United States v. Garner, 338 F.3d 78 (1st

Cir.), cert denied, 124 S.Ct. 948 (2003), a case in which the

police found drugs and a gun hidden in a hole in the defendant's

basement wall, we concluded:

> When guns and drugs are found together and a
> defendant has been convicted of possession
> with intent to distribute, the gun, whether
> kept for protection from robbery of drug-sale
> proceeds, or to enforce payment for drugs, may
> reasonably be considered to be possessed 'in
> furtherance of' an ongoing drug-trafficking
> crime.

Id. at 81.[5]

Although this case is closer than Luciano and Garner, we

conclude that there was sufficient evidence to establish beyond a

reasonable doubt that Grace possessed the .38 caliber firearm to

protect her drug supply and the proceeds of her drug sales.  Grace

had not owned a firearm for approximately a decade prior to her

purchase of the .38, which she purchased after the room in which

she stored her drugs was burglarized.  In light of the testimony of

_____

[5]Luciano cited United States v. Ceballos-Torres, 218 F.3d 409,
413-15 (5th Cir. 2000), which noted that the 'in furtherance of'
language in section 924(c) protects drug dealers whose only
firearms are "unloaded antiques mounted on the wall" or those who
keep a pistol for target shooting or hunting.  Id. at 415.  After
noting that the gun in that case was loaded, accessible, and stored
in an apartment with drugs and that the defendant acquired the gun
illegally, the Ceballos court concluded that the gun protected the
defendant's drugs and money against robbery and, therefore, that
the defendant's possession of the gun furthered his drug
trafficking.  Id.

Agent Duquette, the court was entitled to disbelieve Grace's claim at trial that no drugs were stolen during the first robbery, and to conclude that she purchased the handgun specifically to prevent such robberies of drugs and drug proceeds in the future. Indeed, Grace had good reason to fear such robberies. She routinely kept thousands of dollars of cash and drugs in her computer room and sold drugs in the adjoining room. Furthermore, she suspected that one of her main drug suppliers was responsible for at least one of the robberies.

To counter the conclusion that she possessed the gun to protect her drugs and drug proceeds, Grace derides as "fanciful" the notion that she could have used an unloaded gun to protect herself and her drugs. Unfortunately for Grace, our own precedents and those of other circuits demonstrate that a gun does not even have to be operational, let alone loaded, to qualify as a firearm for section 924 purposes. See, e.g., United States v. Kirvan 997 F.2d 963, 966 (1st Cir. 1993) ("It is common ground that the gun need not be proved to be loaded or operable in order to convict . . . ."); United States v. Taylor, 54 F.3d 967, 975 (1st Cir. 1995) (relying on Kirvan to state that a firearm does not need to be loaded or operational and concluding that "the prosecution satisfies its burden simply by showing that the gun is a gun"); see also United States v. Hunter, 101 F.3d 82, 85 (9th Cir. 1996) ("Congress intended the ten-year penalty to apply to unloaded and

inoperable semiautomatic weapons as well."); <u>United States</u> v. <u>Coburn</u>, 876 F.2d 372, 375 (5th Cir. 1989) ("The fact that a firearm is 'unloaded' or 'inoperable' does not insulate the defendant from the reach of section 924(c)."). Even an unloaded firearm can intimidate others and help to further the defendant's drug-related activities. <u>See</u> <u>Hunter</u>, 101 F.3d at 86 ("[I]ntimidation will be caused by a semiautomatic assault weapon whether the gun is loaded and operable or not."); <u>United States</u> v. <u>Martinez</u> 912 F.2d 419, 421 (10th Cir. 1990) ("Unloaded firearms have the same effect on victims and observers when pointed or displayed, tending to intimidate, and also increase the risk of violence by others who may respond to the perceived danger represented by the (presumably) loaded gun."). Although the unloaded gun is arguably helpful evidence for Grace, <u>see, e.g.</u>, <u>Lawrence</u>, 308 F.3d at 630-31 (considering the fact that the defendant's firearm was unloaded as one piece of evidence demonstrating that the defendant did not possess the gun in furtherance of a drug trafficking crime), it did not require the judge to acquit her.[6]

---

[6]Grace also argues that even if she did purchase the gun to protect her drugs and drug proceeds, "the factual circumstances at the time of her arrest months later demonstrate that any intent she may have had no longer existed and in fact was abandoned." We do not evaluate the legal efficacy of this "abandoned intent" argument because the court had ample grounds to conclude, as we have already noted, that she possessed the gun at the time of her arrest to protect her drugs and drug proceeds.

Grace claims that she was denied effective assistance of counsel at the sentencing hearing because her attorney failed to address adequately a question from the court about her drug use while she was out on bail and that, as a result, she did not receive a reduction in her sentence for acceptance of responsibility. The district court asked at the sentencing hearing: "What relevance to my determination is it that during the time she was on release that she used drugs? How does that impact on remorse and acceptance of responsibility in this particular case?" Her attorney answered: "That is a factor the court can consider, and we would say that's one factor of many factors. And when the court puts all the factors into the balance, that that alone should not be sufficient to deny her acceptance of responsibility, but certainly the court can consider that." Grace characterizes that response as "vague" and "non responsive" and says that there is a reasonable probability that the court would have granted her a sentencing reduction if her counsel had been more forthcoming.

"The rule in this circuit is that a fact-specific claim of ineffective legal assistance cannot be raised initially on direct review of a criminal conviction, but must originally be presented to the district court." United States v. Osorio-Pena, 247 F.3d 14, 19 (1st Cir. 2001) (internal quotation marks omitted).

This rule "allow[s] for full development of the record needed to place the adequacy of a defendant's representation into proper perspective." Id. at 19-20 (internal quotation marks and citation omitted). We will deviate from this rule "where the critical facts are not genuinely in dispute and the record is sufficiently developed to allow reasoned consideration of an ineffective assistance claim." United States v. Natanel, 938 F.2d 302, 309 (1st Cir. 1991).

There is no such record in this appeal from the defendant's sentence. To establish an ineffectiveness of counsel claim, Grace must show that her trial counsel's representation fell below an objective standard of reasonableness, and that but for her counsel's errors, there is a "reasonable probability" that she would have received the requested reduction in her sentence. See Strickland v. Washington, 466 U.S. 668, 687-88 & 694 (1984); Epsom v. Hall, 330 F.3d 49, 53 (1st Cir. 2003) ("[An] incompetent counsel [claim] requires two elements: first, trial counsel's performance must be deficient in some way sufficiently substantial to deny him effective representation; and second, that deficiency must have resulted in prejudice, defined as a 'reasonable probability that, but for counsel's unprofessional errors, the result . . . would have been different.'") (quoting Strickland, 466 U.S. at 687); see also Glover v. United States, 531 U.S. 198, 202-04 (2001) (applying Strickland in the sentencing context); Robinson v. Ignacio, 360

F.3d 1044, 1055 (9th Cir. 2004) (holding that although <u>Strickland</u> dealt with the denial of counsel at trial, there is no reason not to extend it to the sentencing context, since sentencing is a "critical stage of the criminal proceeding."). We cannot determine from this record why Grace's trial counsel gave the answer that he gave nor whether his strategy, if any, was erroneous. Moreover, we cannot say whether there is a reasonable probability that Grace could have otherwise received the reduction. A sentencing court must consider many factors to determine whether a defendant should receive a reduction for acceptance of responsibility. <u>See</u> U.S.S.G. § 3E1.1 cmt. n.1. Having confronted the defendant in person, the district court is in a "unique position" to do so. <u>Id.</u> § 3E1.1, cmt. n.5. We simply cannot review Grace's ineffectiveness of counsel claim on the record as it currently stands. <u>See</u> <u>United States</u> v. <u>Hughes</u>, 330 F.3d 1068, 1068 (8th Cir. 2003).

**<u>Affirmed.</u>**