# United States Court of Appeals
# For the First Circuit

———————

No. 03-1230

UNITED STATES OF AMERICA,

Appellee,

v.

JUAN E. VILLAFANE-JIMENEZ,

Defendant/Appellant.

———————

No. 03-1231

UNITED STATES OF AMERICA,

Appellee,

v.

EDDIE S. RODRIGUEZ-NICHOLS

Defendant/Appellant.

———————

No. 03-1340    UNITED STATES OF AMERICA

Appellee

v.

MANUEL PENA-MARTINEZ,

Defendant/Appellant.

———————

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Carmen Consuela Cerezo, U.S. District Judge]

_____

Before

Boudin, <u>Chief Judge,</u>

Howard, <u>Circuit Judge,</u>

Carter,[*] <u>Senior District Judge</u>.

_____

    <u>Gabriel Hernandez-Rivera</u> for appellant Juan E. Villafane-Jimenez.
    <u>Wilberto Mercado</u> for appellant Eddie S. Rodriguez-Nichols.
    <u>Lydia Lizarribar-Masini</u> for appellant Manuel Pena-Martinez.
    <u>German A Rieckehoff</u>, Assistant United States Attorney, with whom <u>H.S. Garcia</u>, United States Attorney, <u>Nelson Perez-Sosa</u>, Assistant United States Attorney, were on brief for appellee.

_____

June 7, 2005

_____

---

[*]Of the District of Maine, sitting by designation.

**Per Curiam**.

## I.    PROCEDURAL BACKGROUND

The Appellants (hereinafter "Defendants") were convicted after jury trial in the District of Puerto Rico of the offenses of conspiracy to distribute cocaine, attempting to distribute cocaine, both in violation of 21 U.S.C. §§ 846 and 841(a)(1), and of carrying firearms during and in relation to the commission of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A). Defendants Villafane-Jimenez (hereinafter "Villafane") and Rodriguez-Nichols (hereinafter "Rodriguez") were each sentenced to prison terms totaling 295 months. Defendant Pena-Martinez (hereinafter "Pena") was sentenced to a prison term of 352 months.[1] All three Defendants were made subject to supervised release terms of five years.

The Defendants appeal their respective convictions and challenge various aspects of their respective sentence determinations and the imposition of certain specific conditions of supervised release. This Court has appellate jurisdiction over the case under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a). The Court will consider the issues the Defendants generate on appeal, affirm

---

[1]The total sentences of Villafane and Rodriguez are made up of concurrent sentences on Counts I and II of 235 months plus a statutorily mandated consecutive sentence thereto of 60 months on Count III.  Pena's total sentence is made up of 292 month concurrent sentences on Counts I and II plus the consecutive 60 month sentence on Count III.

their convictions and affirm their sentences in part, remanding for resentencing of each Defendant only with respect to the drug treatment condition of supervised release.

## II.  STATEMENT OF FACTS

There is no significant dispute as to the specific acts and conduct of each of the Defendants that are the basis for their indictments and convictions.  The Defendants admitted to these at trial.  The only dispute goes to the intent with which the Defendants engaged in that conduct.  The conduct itself is displayed in the record as follows.

Special Agent Jeffrey Pelaez was employed by the Federal Bureau of Investigation's (hereinafter "FBI") Public Corruption Unit in Washington, D.C.  He was assigned to the FBI resident agency in Fajardo, Puerto Rico, to investigate allegations of police corruption within the Puerto Rico Police Department (hereinafter "PRPD").  He was in charge of an operation known as "Honor Perdido."[2]  The operation lasted from June 2000 to June 2001.  In the course of the operation, Pelaez recruited ex-police officer Arturo Ortiz-Colon (hereinafter "Ortiz") as an informant and undercover operative.  Ortiz had lost his position in the Puerto Rican police because of prior criminal activity.  He had also witnessed criminal activity of officers within the PRPD.

_____

[2]This operation generated this Court's consideration of issues not involved in the present case in United States v. Flecha-Maldonado, 373 F.3d 170 (1st Cir. 2004).

-4-

Pelaez launched Ortiz as his operative in a drug "sting" operation aimed at corrupt police officers.

Arrangements were made for Ortiz to pose as an actual FBI agent. He was given credentials, agency business cards, a marked vehicle, and a gun, all to create the impression that he was an FBI agent. The FBI rented two apartments at an expensive resort. Ortiz lived in one of those apartments, which was wired for audio and video surveillance, and the FBI used the other apartment to monitor what was happening in Ortiz's apartment.

The evidence would support a jury finding that Ortiz was to pretend to be a corrupt FBI agent involved in a drug trafficking organization in which "the boss" was a fictional Columbian male named "El Viejo." Ortiz was to appear to be looking, on behalf of the fictional El Viejo, for law enforcement officers to transport El Viejo's drug shipments, and to protect the shipments from rival drug gangs and intervening police officers. He was to approach individuals who he personally knew, or had reason to believe, were corrupt,[3] and solicit them to carry out an illegal drug transport and be paid to do it.

The Government's evidence supports a finding that Ortiz did, in fact, pose to the Defendants as a corrupt FBI officer engaged in illicit drug trafficking. The jury could reasonably have found

[3]Neither Villafane nor Rodriguez were known to Ortiz prior to the time he recruited them after being introduced to them by Pena. None of the Defendants had any record of criminal convictions.

that he approached Pena representing that he needed policemen willing to assist him in a major illegal shipment of contraband cocaine by unloading the drugs, transporting the drugs to their destination, unloading them from the vehicles, and providing throughout security to the operation as armed, uniformed police officers.[4]  Agent Pelaez described at trial a meeting between Ortiz and the Defendants on May 9, 2001, which he monitored by television surveillance.  Ortiz there discussed with the Defendants the "specifics" of how the transportation of cocaine would occur.  He told the Defendants that the cocaine was owned by "El Viejo," who would be the person paying them for their services.  Agent Pelaez's testimony also described the Defendants' videotaped activities in unloading the drugs from a boat at a marina and putting them in a Jeep Cherokee on May 11, 2001.  All of the Defendants handled and transported the drugs and Rodriguez patrolled the area with "a fully automatic machine gun" to protect against any interference with the conduct of the operation.

Pena and Rodriguez left the marina area where the drugs were obtained in Ortiz's vehicle with the drugs and a rifle and their sidearms.  Villafane, also armed, followed them in a marked police

---

[4]The prosecution witnesses testified at trial that they did not specifically require the Defendants to carry firearms, but that it was assumed that the Defendants would do so.  This assumption was apparently understood by the Defendants as they appeared on the day of the transport/escort uniformed and armed.  They contended at trial that this occurred only because they were fresh from other police duties.

cruiser "to provide security." They took the drugs to Ortiz's apartment. Their activities there were videotaped.[5] At a subsequent meeting on May 14, the Defendants were each paid $5000 in cash and they discussed the operation and how it could be better done the next time. Thus, the thrust of the Government's evidence was that the three Defendants understood that they were being recruited by a corrupt FBI agent to participate in an illicit, major drug trafficking project for which they would receive at least $4000 and that they willingly participated therein.

Defendants challenge the validity of the drug convictions on Counts I and II and their convictions on Count III, claiming that they thought all along that Ortiz was a legitimate FBI officer seeking their assistance in legitimate law enforcement activities aimed at curtailing an illegal drug transaction.

The Defendants also attack their convictions on Count III on the separate basis that they carried their weapons because they were required by law to do so when in uniform and that the presence of the firearms at the scene of their drug trafficking activities was merely coincidental to the drug trafficking activities and not

_____

[5]Various videotapes and audiotapes reflecting the interaction of the Defendants with Ortiz at various stages of the operation were played to the jury at trial.

"in relation to" the drug trafficking activities, as the statute,

18 U.S.C. § 924(c)(1)(A), requires.[6]

### III.   THE CHALLENGES TO THE CONVICTIONS

### A.    The Estoppel by Entrapment Defense

Defendants seek reversal of their convictions because, they

allege, their prosecution violates fairness elements of Due Process

of Law under the Federal Constitution.  They claim this to be so

---

[6]We note in advancing to a discussion of the substantive aspects of Defendants' challenges to their convictions, as distinguished from the sentencing issues they generate, that these challenges come to us on two separate procedural footings. We have reviewed carefully these circumstances and conclude that the substantive issues are paramount to our resolution of the appeal and that the procedural nuances below have no impact on that resolution.

We assume, for reasons of judicial economy, and despite uncertainties that arise from the contours of his briefing on appeal, that Defendant Pena intends that his arguments for reversal of the conviction on Count I also relate to that on Count II.

The standard of review for determining whether the denial of a Rule 29 Motion is erroneous is de novo. United States v. Rivera-Ruiz, 244 F.3d 263, 266 (1st Cir. 2001); United States v. Hernandez, 146 F.3d 30, 32 (1st Cir. 1998).  The standard is the same in conducting a review of the record on appeal to examine the viability of a free-standing challenge to the sufficiency of the evidence.  United States v. Caron, 64 F.3d 713, 715 (1st Cir. 1995).

We treat the position of all three Defendants in seeking reversal of the convictions on all three Counts as raising the same two substantive issues for resolution: (1) whether the evidence was sufficient to establish beyond a reasonable doubt each Defendant's specific intent to commit each of the three crimes by reason of an estoppel by entrapment and (2) whether the evidence as to Count III was sufficient to prove beyond a reasonable doubt that each Defendant's carrying of a firearm was "in relation to" the commission of the drug trafficking offenses.

-8-

because they offered evidence, disputed by the Government's evidence at trial, that they reasonably relied on representations, which they allege were made by Ortiz, that the conduct upon which their convictions are based was part of a legitimate law enforcement project Ortiz was carrying out in his capacity as an FBI agent. This, they argue, implicitly represented to them that their conduct was legal.[7] Hence, they assert, the convictions should be vacated because the Government is estopped from prosecuting them by reason of their entrapment into the illegal activity.

The short answer to this contention is that the Defendants have the burden of proof to establish at trial their defense of estoppel by entrapment and they failed to do so. They had a full opportunity to adduce any evidence they wished in support of that defense, their counsel argued the defense to the jury, and the district court gave instructions to the jury concerning the defense (as to which there were no objections), and the defense was ultimately submitted to the jury on a disputed record. The result at trial was that the jury found for the Government. We conclude

---

[7]It is to be noted that the record does not disclose that the Defendants have ever made any specific claim that Ortiz told them in so many words, that is, made an "affirmative representation," that their conduct was, or would be "legal." Such an affirmative representation has been held to be required as an element of the estoppel by entrapment defense, to be proven by the Defendant. United States v. Ellis, 168 F.3d 558, 561 (1st Cir. 1999). That argument is not made by the parties here.

after a careful review of the trial record that the evidence is sufficient to support that result.

In briefing on this appeal, the Defendants simply reargue the factual aspects of the defense in juxtaposition to the Government's evidence that they, in fact, committed each of the charged offenses. On a general theory, Defendants assert that all of the evidence is insufficient to prove that they possessed specific criminal intent to commit the offense. There is no claim made here that evidence material to the defense was limited or excluded at trial. It is not contended that the issues generated by the defense were not submitted to the jury or that those issues were taken away from jury consideration on the evidentiary record. Moreover, it is not contended that there was any defect in the jury instructions given by the Court in respect to the defense. The thrust of the arguments as they are made can only be viewed as the assertion of a claim that the Defendants established at trial the defense of estoppel by entrapment as a matter of law. Review of such a claim is plenary because "the issue is whether or not there was sufficient evidence to support a theory of defense ...." Caron, 64 F.3d at 715.

In order to establish the subject defense at trial, the Defendants were required to establish that (1) a governmental official told them their conduct was legal; (2) they relied on that representation; (3) their reliance was reasonable in the

circumstances; and (4) given that reliance, prosecution for the conduct is unfair. <u>Ellis</u>, 168 F.3d at 561; <u>United States</u> v. <u>Smith</u>, 940 F.2d 710, 715 (1st Cir. 1991).

Our careful review of this record convinces us that there is no basis to conclude that the Defendants' proof warranted the acceptance of the defense as a matter of law. Clearly, the evidence made, at best, issues of fact for a fact-finder to resolve as to the viability of the defense.

Whether a reasonable fact-finder should be persuaded of the validity of the defense depends entirely, in the circumstances of this record, upon the resolution of any number of disputed issues of fact and the determination of the credibility, in whole or in part, of nearly every witness who testified at trial. These are typical jury functions for the resolution of disputed questions of fact.

The lynchpin for the resolution of the issue of the Defendants' intent is the determination of fact as to what Ortiz told them (and what they understood) about the legal status of the operation: either that it was an exercise in legitimate law enforcement (as the Defendants contend) or that it was to be assistance to a corrupt FBI agent in illegally transporting, escorting, and safeguarding a shipment of contraband drugs for a garden-variety civilian drug trafficker (as the Government contends). A choice among these two alternatives resolves the

issue of whether there is sufficient evidence to establish the Defendants' guilty intent.

All Defendants asserted in ambiguous language that they were led to believe that the project was a covert or undercover police operation.  Ortiz and Pelaez testified that the Defendants were told it was an illegal activity from the beginning.  There is abundant evidence in the record to support the Defendants' convictions.  It could be concluded that the Defendants were told the operation was an illegal one and that the description and circumstances of the project would have left them, as experienced police officers, no room to reasonably believe that it was a legitimate law enforcement effort.  Further, the evidence supports a finding that they knew, because told by Ortiz, that there would be no arrest as a result of the seizure and transport of the contraband, a strange circumstance for a legal police operation.  They were told that they were to be paid a sum of money (not less than $4000) for their participation in the project that was far in excess of the usual rate of compensation of line police officers for an a couple of hours of official work.  They were told the ultimate amount of their compensation would depend upon the amount of drugs transported by them.  They were told that the money for their compensation would come from the supposed owner of the drugs, not from FBI funds.  They were ultimately paid and accepted $5000 each for their efforts and the payments were made in cash at

Ortiz's apartment. The circumstances of their compensation and the determination of the amount of it were, alone, forceful, persuasive proof from which a reasonable jury could conclude that the Defendants knew they were not participating in a legitimate police operation and were a confirmation of Defendants' culpable knowledge and intent from the very beginning of their involvement in the operation. That confirmation is entirely consistent with all of the other evidence indicating the guilt of the Defendants.

We conclude that the defense was properly submitted to the jury on unchallenged instructions, that no error occurred in that respect, that the record amply supports the jury's verdict and that the Rule 29 Motion was properly denied.

## B. The Weapons Charge-Count III

We assume the Defendants press the estoppel by entrapment argument to attack the existence of specific intent on Count III, but we find that position is without merit in the record. First, the argument that Rodriguez never drew his sidearm overlooks entirely that evidence in the record (that was undisputed) that he was asked to carry a police-owned automatic rifle during the transport and escort activities to discourage intervention by others, and that he did, in fact, do so. This evidence, by itself, is enough to permit a jury to conclude that Rodriguez had the general knowledge and intent to carry a firearm during and in

relation to his activity in the transport/escort as charged in Count III.

The Government did not need to prove that Defendants specifically intended to use or did use a firearm in the course of the transport activity in order for a jury to convict them of the Count III offense. The Government needed only to prove individually their general intent, e.g., that they each knew that they carried a firearm during the course of the drug offense conduct, in order to lay a predicate in the evidence that was adequate for their convictions on Count III. See United States v. Brown, 915 F.2d 219, 225 (6th Cir. 1990). We find that the evidence clearly supports the existence of that level of knowledge by all three Defendants, beyond a reasonable doubt.

Defendants also advanced below the argument on the Rule 29 Motion, and reiterate it here, that the evidence was insufficient to satisfy the "nexus" requirement of the violation charged in Count III. This element of the possession offense is treated at length in United States v. Grace, 367 F.3d 29 (1st Cir. 2004). There we said that the current version of the statute does not require the Government to show that the Defendant "actively employed" the firearm "in furtherance of" the drug crime. Id. at 35. We held, however, that it must be shown in order to secure a conviction that the Defendant has "possessed the gun to further the drug crime." Id. (emphasis added). In Grace, the underlying

offenses were possession and distribution of drugs.  The Court there found that the possession of the gun was in furtherance of the possession and distribution of the drugs.  We said that the "government must illustrate through specific facts, which tie the defendant to the firearm, that the firearm was possessed to advance or promote the criminal activity."  Id. (quoting United States v. Lawrence, 308 F.3d 623, 630 (6th Cir. 2002)).

The evidence material to Count III of this Indictment can properly be evaluated on the basis that the jury approached its consideration of this Count having concluded that the Defendants were guilty on Counts I and II.  Once it is established that the Defendants had the specific intent to engage in a conspiracy to distribute drugs illegally and to participate actively in the attempt to distribute them, the question becomes whether the evidence established a "nexus" between that criminal conduct on Counts I and II and possession by the Defendants of the firearms.[8]

As noted previously, in the case of Rodriguez, the existence of such a nexus is transparently clear because he patrolled the drug transfer site at Ortiz's instructions with an automatic rifle from the Defendants' police cruiser.  It was easily to be deduced

_____

[8]The evidence is overwhelming (indeed, it is undisputed) that each Defendant personally carried at least one firearm during the transport/escort activities.  This evidence is clearly sufficient to meet the requirement of specific facts which tie the Defendants to the firearms.  Grace, 367 F.3d at 35; United States v. Vazquez Guadalupe, __ F.3d __, No. 02-2505, 2005 WL 1163678, at *1 (1st Cir. May 18, 2005).

-15-

by the jury in the circumstances that the obvious intent of that conduct was to discourage "intervenors" from interfering in the transfer and escort of the drugs. That conduct was clearly "in furtherance of" the transport and escort of the drugs.

The situation is little different in the cases of Villafane and Pena even though they assert (and the record does not contradict) that they never drew or used their sidearms in the course of the transport/escort activity. As noted above, the brandishing or use of firearms is not a necessary element of the Count III offense. Grace, 367 F.3d at 35. The evidence supports the conclusion that the sole and mutually understood purpose of Defendants' participation in the activity as law officers was to prevent, by their presence, other drug dealers or other legitimately motivated police officers from interfering in and disrupting the transport of the drugs. It is obvious that the presence of the guns, displayed in the open, by the Defendants as active participants in the illegal activity, would have a tendency to discourage interruption of the transport by other persons and was intended by the Defendants to do so. Further, it could be fairly inferred by the jury that potential intervenors would likely also bear arms and that the presence of the Defendants' firearms in open view would disabuse any potential intervenor of any thought that he would enjoy a superiority of force in intervening in the

situation.  The possession of the firearms did, as intended by the Defendants, "further" the illegal drug trafficking activities.

We are satisfied, viewing the evidence in the light most favorable to the prosecution, that this record clearly justifies a rational jury in concluding, beyond a reasonable doubt, that all of the Defendants possessed their firearms at the time of the transport/escort activity in order to further the successful execution of the illegal drug trafficking activity in question. The possession was "in relation to" that activity.  Id.  The verdict on Count III is supported in the record as to all three Defendants, and the Rule 29 Motion was properly denied.

## IV.  THE CHALLENGES TO THE ELEMENTS OF SENTENCE

Defendants raise on appeal three distinct issues of substance in respect to their sentences: (1) that Apprendi v. New Jersey, 530 U.S. 466 (2000), Blakely v. Washington, 124 S. Ct. 2531 (2004), and United States v. Booker, 125 S. Ct. 738 (2005) require a remand for resentencing in light of the non-mandatory status of the United States Sentencing Guidelines; (2) that the district court committed errors in imposing on Defendant Villafane a condition of supervised release requiring that he submit to searches by his supervising officer while on his term of supervised release; and (3) that the district court erred in the structure of the condition of

supervised release imposed on Defendants Pena and Villafane in respect to the frequency of their submission to drug testing.[9]

## A.  The Blakely/Booker Challenges[10]

The record makes it clear that in determining all of these sentences the district court followed the analytical regime in place before rendition of the decision in Booker.  It is to be presumed and it is, in fact, clear from the record that the District Judge considered herself required to determine and impose sentences as established by the Sentencing Guidelines.  It is equally clear that in working out the necessary guideline determinations, she made several findings of fact critical to the

---

[9]Defendants Pena and Rodriguez also raise issues concerning the district court's application of Guidelines § 3C1.1 (obstruction of justice), § 3B1.3 (abuse of position of public authority), and § 3E1.1 (acceptance of responsibility).  We have carefully reviewed these claims, which were forfeited below, United States v. Antonakopoulos, 399 F.3d 68, 76 n.7 (1st Cir. 2005), for the existence of plain error.  United States v. Olano, 507 U.S. 725, 733 (1993).

We find that on the records made below at trial and in the sentencing proceedings these claims of error are facially without merit and that no semblance of error, plain or otherwise, exists in the district court's findings in support of its application of the subject Guidelines.  These claims do not warrant any detailed discussion.  It suffices to say that the record contains abundant evidence to support the conclusions that Pena obstructed justice by his testimony at trial, both Pena and Rodriguez abused a position of public trust and authority by participating in a drug trafficking transaction as uniformed police officers, and that neither was entitled to receive a reduction in the offense level because they had truly accepted responsibility for their acts.

[10]This analysis tracks closely that set out in the case of United States v. Bailey, 405 F.3d 102 (1st Cir. 2005).

determination of the extent of the final sentences which were not within the scope of jury findings in determining the guilt of the Defendants and which were not admitted by the Defendants. It is also clear that she made those findings upon application of the preponderance of the evidence standard.

There is now no room for doubt that sentences based upon a predicate of mandated compliance with the requirements of the Sentencing Guidelines do not now pass constitutional muster. The sentences imposed on these Defendants do not comply with the holding of Booker in that respect.

The Defendants did not, however, object to their sentences on Sixth Amendment grounds in the district court.[11] Because Defendants

_____

[11]None of the Defendants made any attack on the sentences in the district court on Sixth Amendment or other constitutional grounds. Such an assertion of error was first made under Blakely by Defendant Rodriquez in his second amended brief filed on July 20, 2004, while this case was pending for argument on this appeal. Defendant Villafane made his first assertion of a Blakely error in his Supplemental Brief of Appellant filed on August 18, 2004. Pena did not challenge the constitutionality of the Sentencing Guidelines or assert the existence of error under Apprendi in either the district court or in the first round of briefing on this appeal.

Thereafter, on January 12, 2005, while this case was under advisement, the Supreme Court decided Booker, confirming the application of the holdings in Apprendi and Blakely to sentences imposed under the United States Sentencing Guidelines. This Court then entered on March 8, 2005, its standard order in such cases inviting the briefing of any claims made under Booker and its antecedent authorities. All three Defendants thereafter filed supplemental briefs asserting the existence of Booker error and the government has responded to those assertions by its own supplemental brief.

made no arguments in the district court concerning the constitutionality of the Guidelines or the application of the Guidelines to their sentences under Apprendi, we review only for plain error.[12]  See Antonakopoulos, 399 F.3d at 76.[13]

Under the four-part plain error test outlined in Olano, we grant relief only if we find (1) an error, (2) that is plain, and that not only (3) affected the defendant's substantial rights, but also (4) "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings."  Antonakopoulos, 399 F.3d at 77 (quoting Olano, 507 U.S. at 736).  The Defendants bear the burden of persuasion with respect to all four elements of the test.  See United States v. Gonzalez-Mercado, 402 F.3d 294, 302 (1st Cir. 2005) (citing Antonakopoulos, 399 F.3d at 77).

The first two prongs are satisfied here because the district court treated the Guidelines as mandatory at sentencing.  See Antonakopoulos, 399 F.3d at 77.  To meet the third prong of the

---

[12]The Defendants could not have challenged in the district court on the basis of Blakely because that decision had not been issued at the time of imposition of the sentences.

[13]We reject any suggestion that Defendants' initial challenges at sentencing were sufficient to preserve the issue of the constitutionality of the Sentencing Guidelines for plenary review. Although we treat "almost any colorable claim" as preserving Booker error, see United States v. Heldeman, 402 F.3d 220, 224 (1st Cir. 2005), here it is clear that the objections at sentencing in the court below were directed solely to the sufficiency of the evidence supporting the district court's findings in determining the Total Adjusted Offense Level.

test Defendants must show a "reasonable probability" that the district court would impose a more favorable sentence to the Defendants under the now "advisory" Guidelines. Id. at 75. "[W]e are inclined not to be overly demanding as to proof of probability where, either in the existing record or by plausible proffer, there is reasonable indication that the district judge might well have reached a different result under advisory guidelines." Heldeman, 402 F.3d at 224; accord United States v. Vega Molina, No. 03-1625, 2005 WL 1177221, at *19 (1st Cir. May 19, 2005).

Each Defendant has failed to present us with any argument of substance regarding the probability of a sentence reduction on remand in his case. Rather, they invite us to disregard Antonakopoulos and accept a per se remand rule in every case where a Booker error occurs. They argue that we should presume that the district court would have analyzed the case differently were it not for the mandatory nature of the Guidelines. That position was squarely rejected in Antonakopoulos.

We decline the Defendants' invitation to ignore Antonakopoulos. Absent unusual circumstances not present here, panels of this court are bound by prior circuit decisions. See United States v. Rodriguez, 311 F.3d 435, 438-39 (1st Cir. 2002).[14]

---

[14]To the extent Defendants seek to distinguish their case from Antonakopoulos, the effort is unpersuasive. The district court in Antonakopoulos faced a set of sentencing issues nearly identical to those presented here. See Antonakopoulos, 399 F.3d at 82 (noting that the district court had made no less than three factual

Because Defendants have entirely failed to "advance any viable theory as to how the Booker error" prejudiced their substantial rights,[15] and because we find nothing in the record to "suggest a

findings resulting in sentence enhancements beyond that authorized by the jury verdict and also denied a request for a downward departure).

[15]Pena's only suggestion of a basis for remand is that "[i]n the instant case, all enhancements could have been disputed in a different light as they were not mandatory." Supplemental Brief for Appellant [Pena], at 15. This is far from a showing, to a reasonable probability, that on remand the district court would, in fact, impose a lesser sentence, especially in light of the fact that Pena presented his arguments on the enhancements at the original sentencing and they were considered by the district court. Even though on remand the Guidelines would be "advisory," no basis is shown by Pena to believe it to be reasonably probable that a sentence on remand would actually be more favorable to him.

Villafane likewise makes no showing of reasonable probability of a more favorable sentence on remand, arguing instead that "neither the defendant nor this court will be able to know whether the District Court, knowing [that] the Guidelines now are not mandatory would apply the sentencing factors set forth ... [in 18 U.S.C. §3553(a)] and determine the same or a lower more reasonable and appropriate sentence." Supplemental Brief for Appellant [Villafane] on "Booker" Errors, at 5. However, absent any demonstration of some reason to believe it probable that on remand a lower sentence would actually result, this is nothing more than an argument for the per se remand rule on occurrence of a Booker error, expressly rejected in Antonakopoulos. A suggestion of the possibility of a favorable sentence is not a showing of a reasonable probability of a more favorable sentence on remand as is now required. Bailey, 405 F.3d at 114.

Rodriquez argues, in the face of the contrary holdings in Antonakopoulos and Bailey, that "a Sixth Amendment Booker error is a structural error as one in which prejudice ought to be presumed." Supplemental Brief Pursuant to Invitation by the Court (Rodriguez), at 6 (unnumbered). He suggests that on remand the district court could consider more favorably the factors put forth at sentencing in respect to Defendant's absence of any criminal record, an allegedly unblemished police service record, a good reputation in the community, and his alleged acceptance of responsibility. Id.

-22-

basis for such an inference," we deny the requests to remand for Booker-error.  Gonzalez-Marcado, 402 F.3d at 303.

### B.  Pena's Claim of Sentencing Manipulation

Pena's contention in respect to a claim of sentencing manipulation must be addressed, however, as it is external to the district court's determination of his sentence.

Pena asserts that he is the victim of sentencing factor manipulation because the Government devised and controlled the performance of the sting operation that snared him.[16]  We have said that sentencing factor manipulation occurs "when a 'defendant, although predisposed to commit a  minor or lesser offense, is

---

at 8 (unnumbered).   However, he made no showing that it is reasonably probable that the district court would, in fact, reduce the sentence on remand in light of these factors, all of which were considered at the original sentencing.

> It is far from necessarily true, ... that a judge who found the facts underlying an enhanced sentence would have reached a different result under a post-Booker regime ....   The use of judicial factfinding, then, ordinarily cannot alone meet the 'reasonable probability' standard of the third Olano prong.

Antonakopoulos, 399 F.3d at 79-80.

[16]The Government suggests in brief that Pena has waived this issue by not raising it in specific terms at the time of imposition of sentence.  We find no waiver.  Defendant raised the issue in objections to the Pre-Sentence Report, and the district court noticed the issue in its Order of February 6, 2003, ruling on the objections and overruling all of them.  Order (Docket Entry No. 198).  Pena, in allocution at the time of imposition of sentence, argued to the Court that the Government had engaged in misconduct in allegedly entrapping him into committing the offenses of conviction.

entrapped in committing a greater offense subject to greater punishment.'" United States v. Woods, 210 F.3d 70, 75 (1st Cir. 2000) (quoting United States v. Staufer, 38 F.3d 1103, 1106 (9th Cir. 1994)). We have very recently limned the nature of conduct necessary to establish sentencing factor manipulation. We said:

> Sentencing factor manipulation occurs where law enforcement agents venture outside the scope of legitimate investigation and engage in extraordinary misconduct that improperly enlarges the scope or scale of the crime. A manipulation claim can be established by showing that the agents overpowered the free will of the defendant and caused him to commit a more serious offense than he was predisposed to commit.

United States v. Barbour, 393 F.3d 82, 86 (1st Cir. 2004) (internal citations omitted). We have also acknowledged that a sentencing court can depart from the Guidelines and statutory minimums based on sentencing factor manipulation if the Defendant shows that the Government has engaged in extraordinary misconduct in bringing about the commission of the offense. United States v. Montoya, 62 F.3d 1, 4 (1st Cir. 1995); United States v. Gibbens, 25 F.3d 28, 31 (1st Cir. 1994).

We review for clear error the district court's denial of Pena's objection on this point. Gibbens, 25 F.3d at 30. There is no merit to Pena's claim. The evidence shows that the Government afforded Pena an opportunity to commit the crimes of conviction, and that he, being predisposed to do so, readily entered into the criminal acts proposed by the Government: conspiracy, attempt to distribute cocaine, and carrying a firearm in relation to a drug

-24-

trafficking offense. The Government did not expose Pena to any lesser offense involving a lesser punishment than that applicable to the offenses of his conviction and then later attempt to entice him into more seriously punishable conduct. The Government's sole effort is shown by the evidence to have been to provide an opportunity to Pena to commit the very offenses of which he stands convicted. <u>Accord</u> <u>Vazquez Guadalupe</u>, 2005 WL 1163678, at *7. There is no evidence whatsoever that the Government attempted to escalate the seriousness of the conduct involved in the offense as originally proposed. The Government offered an occasion for a single transaction: a drug transport/escort while armed. Pena committed the crime he was predisposed to commit. The criminal conduct was not exacerbated beyond the elements of the baseline offenses in the course of the execution of the offenses by Ortiz nor was the conduct otherwise prolonged.[17] There was no pressure put on Pena, despite his assertions to the contrary at sentencing,

---

[17]The evidence does not support any argument that the Count III firearm offense came about because of any sentence manipulation by the Government. The opportunity provided by the Government was for Pena to participate as a police officer in the conduct. As noted in text, he was not required to carry his sidearm though it was assumed by Pelaez and Ortiz that he would do so. He understood and willingly shared in and indulged the assumption. He was asked to patrol the scene of the transport/escort with a rifle and again willingly did so without any need to persuade him to do so. This was all carried out within the usual role of a police officer acting in his official capacity. As such, the conduct was within the context of the three offenses he was given the opportunity to commit. There was no effort to worsen the sentencing consequences of the three offenses. He committed only the crimes he was predisposed to commit.

to engage in the conduct of which he stands convicted. Further, there is absolutely no evidence in the record of illegitimate motive on the part of Ortiz as an undercover agent or of misconduct in his relations as a Government agent with Pena. The district court's denial of the objection was properly grounded in the record.

## C. The Conditions of Supervised Release

Two other points involve the question of whether the Court erred in imposing on each of these Defendants two special terms of supervised release.

### (1) The Search Condition

In supplemental briefing on appeal, Villafane has challenged (for the first time) the district court's imposition of a search condition as part of his supervised release requirements. We need not address whether the condition satisfies the requirements of United States v. Giannetta, 909 F.2d 571 (1st Cir. 1990). The issue is forfeit, and does not amount to a miscarriage of justice meriting our discretionary review. See Olano, 507 U.S. at 736.

### (2) The Drug Treatment Condition

Pena asserts on appeal for the first time that the district court erred when it delegated to the Supervisory Probation Officer by the terms of a condition of supervised release the decision to order him to attend a drug treatment program if he failed a drug

test.  Villafane belatedly joined in the assertion of this claim in his "Supplemental Brief" of August 18, 2004.

Our review of both claims would be for "plain error."  Here, however, the Government concedes that the imposition of the condition constitutes error under United States v. Melendez-Santana, 353 F.3d 93, 101-02 (1st Cir. 2003), and agrees that "the challenged drug treatment condition should be vacated and remanded for re-sentencing."  Government's Br. at 48.  We accept, in the absence of any objection, the Government's concession.[18]  The district court will reconsider the structure of this condition if it is imposed in any new sentence of any Defendant.  See United States v. Ayala-Pizarro, No. 04-1038, 2005 WL 1119755, at *4 (1st Cir. May 12, 2005) ("A remand to correct a delegation error as to conditions of supervised release does not open up any other aspect of a sentence for resentencing.").

**V.   ORDER**

For the foregoing reasons, the conviction of each of the Defendants herein is **AFFIRMED,** and the sentence of each Defendant

---

[18]We note that the same drug treatment condition was also imposed on Defendant Rodriguez.  Because the government concedes the district court's error, and in accordance with the principles of Vazquez Guadalupe, we remand the sentences of all three defendants to the district court to address this issue.  Vazquez Guadalupe, 2005 WL 1163678, at *3 ("In light of the government's concession in the companion case, we will also remand the supervised release portion of Pacheco-Diaz's sentence for the limited purpose of determining whether he was similarly sentenced in error and, if so, for correction of that error.").

is **AFFIRMED,** except for that portion of each Defendant's sentence pertaining to the drug treatment condition as a term of supervised release.  The sentence of each of these Defendants is **VACATED** and **REMANDED** for resentencing consistent with this opinion only as to imposition and structure of the drug treatment condition.