

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-26-2000

# United States v. Baird

Precedential or Non-Precedential:

Docket 99-1305

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

Recommended Citation

"United States v. Baird" (2000). *2000 Decisions.* Paper 138.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/138

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed June 26, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 99-1305

UNITED STATES OF AMERICA

v.

JOHN BAIRD,
       Appellant

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
(D.C. No. 95-cr-00092-1)
District Judge: Honorable Robert S. Gawthrop, III

Argued April 24, 2000

Before: BECKER, Chief Judge, WEIS and
OAKES,* Circuit Judges.

(Filed: June 26, 2000)

        George H. Newman, Esquire
         (ARGUED)
        Newman & McGlaughlin, P.C.
        834 Chestnut Street, Suite 206
        Philadelphia, Pennsylvania 19107

Attorney for Appellant John Baird

_____

*The Honorable James L. Oakes, United States Circuit Judge for the
United States Court of Appeals for the Second Circuit, sitting by
designation.

        Michael R. Stiles, Esquire
         United States Attorney
        Walter S. Batty, Jr., Esquire
         Assistant United States Attorney
         Chief of Appeals
        William B. Carr, Jr., Esquire
          (ARGUED)
         Assistant United States Attorney
        615 Chestnut Street, Suite 1250
        Philadelphia, Pennsylvania
         19106-4476

        Attorneys for Appellee
        United States of America

OPINION OF THE COURT

WEIS, Circuit Judge.

In this section 2255 case, defendant contends that his trial counsel erred in failing to object at sentencing to the use of incriminating admissions made as part of a cooperation agreement with the government and immunized by U.S.S.G. S 1B1.8. We conclude that the government had promised that such information would not be used to increase the defendant's punishment. Consequently, that material should not have been factored into the sentence. Whether counsel's inaction at sentencing constitutes ineffective assistance requires a hearing. Accordingly, we will remand for that purpose.

Defendant John Baird pleaded guilty to a Hobbs Act robbery, 18 U.S.C. S 1951; conspiracy to violate civil rights, id. S 241; and obstruction of justice. Id. S 1503. These charges grew out of the defendant's misconduct as an officer in the Philadelphia Police Department. After he became aware that he was under investigation, defendant cooperated extensively with federal authorities in exposing corruption in the department. A more comprehensive review of the facts underlying this case may be found in the defendant's direct appeal. United States v. Baird, 109 F.3d 856 (3d Cir. 1997).

2

At sentencing, despite the fact that the prosecution had filed a section 5K1.1 motion recommending a downward departure, the court departed upwards from the guideline range of 87–108 months to 156 months. The sentence reached was based, in part, on conduct underlying counts that had been dismissed pursuant to a plea bargain, as well as on information provided by defendant as he had agreed.

At the sentencing hearing, counsel argued that the defendant's own statements had unfairly resulted in a higher guideline calculation, but she did not clearly challenge the use of that material. Neither did she object on the basis of U.S.S.G. S 1B1.8, which generally immunizes from sentencing the consideration of self-incriminating information provided pursuant to an applicable cooperation agreement.

On direct appeal, defendant contended that the District Court erred at sentencing by considering activity underlying the dismissed counts. We affirmed, concluding that such conduct could support the upward departure. Baird, 109 F.3d at 863. As a result of post-sentencing assistance, the defendant's sentence was later reduced to 126 months.

Defendant then filed the present motion under 28 U.S.C. S 2255, asserting that his trial counsel had been ineffective by failing to challenge the adverse use of information that, he argued, was immunized by his cooperation agreement and section 1B1.8. The District Court denied the motion, noting that in the early stages of his cooperation, defendant had attempted to falsely exculpate a fellow officer. Although the cooperation agreement "would have kept all his self-incriminating statements out [so] they could not have been used against him," the court concluded that the defendant's attempts to shield a co-conspirator "breached the deal" and "rendered it null." Accordingly, reasoned the District Court, section 1B1.8(a) was never triggered because the defendant's "own actions . . . caused the agreement to self-destruct."

In this appeal, defendant renews his contention that the government promised that the self-incriminating material he disclosed would not be used for sentencing purposes.

The government counters that it made no such commitment, and in the alternative, contends that defendant breached any purported agreement.

I.

To prevail in his contention that counsel was ineffective, defendant must show both deficiency in performance and prejudice. Strickland v. Washington, 466 U.S. 668, 700 (1984). The "deficiency" step asks whether counsel's conduct "fell below an objective standard of reasonableness" viewed as of the time it occurred. Id. at 688, 690; see also United States v. Gray, 878 F.2d 702, 711 (3d Cir. 1989). The "prejudice" prerequisite asks whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694; see also United States v. Headley, 923 F.2d 1079, 1083 (3d Cir. 1991).

As a threshold matter, the court must determine whether the underlying claim was meritorious. United States v. Mannino, ___ F.3d ___, No. 98-1748, 2000 WL 583645, at *3 (3d Cir. May 15, 2000). The underlying facts are reviewed for clear error, and are subject to independent judgment "on whether the facts thus found constitute constitutionally ineffective assistance of counsel." Government of the Virgin Islands v. Weatherwax, 77 F.3d 1425, 1430-31 (3d Cir. 1996).

An understanding of the defendant's section 2255 motion requires a review of the proceedings leading up to his sentencing. In early December 1994, having learned that he was about to be indicted for conspiracy to violate civil rights, defendant offered to cooperate with the government. Unrepresented by counsel, he signed a brief note prepared by an assistant United States Attorney indicating that "no statements made by you, or other information provided by you during the `off-the-record' proffer, will be used directly against you in any criminal case."

Two days later, on December 9, 1994, and still unrepresented, he signed a more formal letter drafted by the United States Attorney's Office. The letter acknowledged

4

the defendant's desire to cooperate and stated that the earlier "off-the-record" note no longer applied and "[f]rom now on," information furnished was "on the record, and could be admitted against you in the future if you failed to plead guilty" to a Hobbs Act robbery and a conspiracy to violate civil rights. The letter also noted that cooperation could result in a governmental motion for a downward departure.

In the month following, defendant fabricated evidence to exculpate a co-conspirator, Thomas G. DeGovanni. On January 28, 1995, defendant admitted this deception, and later aided the government in obtaining evidence incriminating DeGovanni. There is no evidence or suggestion that defendant took further steps to improperly exculpate himself or others, or to minimize his role in the offenses.

At some point not disclosed by the record, defendant retained counsel. On February 28, 1995, a multi-count indictment was returned against defendant, DeGovanni, and others. In addition to the two offenses enumerated in the December 9 letter, the indictment included four other charges against defendant, including a count for obstruction of justice stemming from his attempted cover-up of DeGovanni.

With defendant now represented, the parties entered into a more detailed, formal plea agreement on March 30, 1995. Defendant agreed to cooperate by disclosing information and testifying if necessary. He also agreed that if he committed any additional crimes, the government could avoid the agreement. In due course, defendant pleaded guilty to counts alleging violations of the Hobbs Act, conspiracy, and obstruction of justice. A presentence report was prepared.

In moving for a downward departure at sentencing, the assistant United States Attorney stated that defendant had "demonstrated a remarkable degree of both candor and recall." Moreover, declared the prosecutor, it was "difficult to conceive that a similarly situated defendant could provide a more substantial level of cooperation in the development of an historical case of police corruption." The

sentencing judge was nevertheless struck by the extraordinary disruption of the criminal justice system caused by the defendant's conduct, and decided to depart upward. Acknowledging the government's section 5K1.1 motion, the judge stated that he was giving an "implicit" downward departure in that he "would be hitting [defendant] harder . . . were it not for the cooperation."

In its response to the section 2255 motion in the District Court, the government conceded that the defendant's "sentencing guideline calculation and [the District Court's] determination to depart upward were based upon matters which included in large part information obtained directly from [defendant]." The presentence report recites in considerable detail numerous instances in which defendant and his co-conspirators "participated in illegal searches of individuals and property, made illegal entries into premises, made illegal detentions, used unwarranted force and threat of force against detainees and stole money and property . . . ."

The probation officer relied on these incidents in recommending upward departures, stating that the defendant's actions had significantly disrupted governmental functions, had led to the imprisonment of many individuals in violation of their civil rights, and had caused many convictions to be overturned. The government alluded to such matters in its sentencing memorandum, stating that "the District Attorney's Office was left in the unenviable position of having to concede the vacating of convictions of literally dozens of drug dealers." The memorandum noted the irony that the defendant's cooperation had widened the scope of culpable conduct before the court.

The District Court considered such incidents in reaching its sentencing decision, finding that there had been "many significant disruptions of many Governmental functions," and that "many of these illicit searches" were later overturned.

II.

In the defendant's direct appeal, we held that evidence underlying dismissed counts was properly considered in the

sentencing process. Baird, 109 F.3d at 863. The question here is quite different and is based on U.S.S.G.S 1B1.8, a guideline provision that excludes certain information from a court's consideration of the sentence to be imposed.

Traditionally, judges exercised wide discretion over the source and type of material used to determine punishment. Williams v. New York, 337 U.S. 241, 246 (1949). This broad authority was codified in 18 U.S.C. S 3577, later renumbered as 18 U.S.C. S 3661, which states that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." This language is quite broad and facially, would appear to bar redaction of information furnished by a cooperating defendant.

In the Sentencing Reform Act of 1984, however, Congress subsequently established the United States Sentencing Commission and guideline system, 28 U.S.C. SS 991, 994(a)(1), and directed that certain factors not be included in sentencing calculations. Id. S 994(d), (e). It also directed that the Commission pay "particular attention" to "providing certainty and fairness in sentencing." Id. S 994(f). Among those factors which were to be used to reduce a sentence, the statute listed "a defendant's substantial assistance" to the government. Id. S 994(n). Guidelines section 1B1.8, which ensures that cooperating witnesses generally do not face increased sentences because of their cooperation, thus satisfies the mandate in section 994(n) that, where appropriate, substantial assistance be rewarded by a reduced sentence.

As an additional phase of the sentencing legislation, 18 U.S.C. S 3553(b) provides that aggravating or mitigating factors not taken into account by the Sentencing Commission may be used in determining an appropriate sentence. See also Williams v. United States, 503 U.S. 193, 200 (1992) (noting that the sentencing court may not depart based "on a factor that the Commission has expressly rejected as an appropriate ground for departure"). When read in conjunction with that provision, section 3661 is thus a "safety net . . . . mak[ing] available for sentencing

any relevant information not considered by the guidelines." United States v. Fairman, 947 F.2d 1479, 1482 (11th Cir. 1991). As we stated in United States v. Bruno , 897 F.2d 691, 695-96 (3d Cir. 1990), the two "sections are to operate in harmony," and information of the type encompassed by section 3661 is subject to the limitations of section 3553(b). In short, reading section 3661 together with the other provisions of the Sentencing Reform Act, including the requirements specifically articulated by Congress, leads us to conclude that U.S.S.G. S 1B1.8, while limiting the otherwise-comprehensive language of section 3661, is enforceable.

We turn then to the guideline at issue. Section 1B1.8(a) states:

> Where a defendant agrees to cooperate with the government by providing information concerning unlawful activities of others, and as part of that cooperation agreement the government agrees that self-incriminating information provided pursuant to the agreement will not be used against the defendant, then such information shall not be used in determining the applicable guideline range, except to the extent provided in the agreement.

U.S.S.G. S 1B1.8(a).

There are several caveats to the general rule. Immunity shall not apply "in the event there is a breach of the cooperation agreement by the defendant." Id . S 1B1.8(b)(4). Other exceptions include information "known to the government prior to entering into the cooperation agreement," id. S 1B1.8(b)(1), and information used "in determining whether, or to what extent, a downward departure from the guidelines is warranted . . . under S5K1.1." Id. S 1B1.8(b)(5). As a corollary, however, the Commission's policy is that self-incriminating information "shall not be used to increase the defendant's sentence above the applicable guideline range by upward departure." Id. S 1B1.8 applic. n.1. The ban on the use of incriminatory evidence applies not only to government attorneys, but also to probation officers in the preparation of presentence reports. Id. S 1B1.8 applic. n.5; see also United States v. Fant, 974 F.2d 559, 564 (4th Cir. 1992).

8

Courts have set aside sentences based on incriminating information obtained from a defendant where there were explicit references to section 1B1.8 in the plea or cooperation agreements. United States v. Washington, 146 F.3d 219, 220, 223 (4th Cir. 1998). In other cases, the existence or scope of a cooperation agreement was at issue. At a minimum, the court must find an agreement that 1) defendant will cooperate "by providing information concerning the unlawful activities of others"; and 2) the government will not use the self-incriminating information provided thereto against defendant. United States v. Evans, 985 F.2d 497, 499 (10th Cir. 1993).

A failure to be explicit or to cite to section 1B1.8 will not by itself vitiate a purported cooperation agreement. In United States v. Shorteeth, 887 F.2d 253 (10th Cir. 1989), the government had promised not to institute additional prosecutions based on information received from the defendant. The court concluded that this agreement embodied an implicit promise not to use that evidence in calculating the sentencing range, stating that "the language and spirit of Guidelines S 1B1.8 require the agreement to specifically mention the court's ability to consider defendant's disclosures during debriefing in calculating the appropriate sentencing range before the court may do so." Id. at 257.

But where an agreement does not embrace immunizing consequences, courts will not read them in. See United States v. Ykema, 887 F.2d 697, 699 (6th Cir. 1989) (concluding that mere promise that "no additional charges" would be brought did not preclude sentence based on drug quantity higher than that stipulated in plea agreement). But cf. United States v. Kinsey, 917 F.2d 181, 184 (5th Cir. 1990) (although promise not to prosecute did not appear to be ban on use of self-incriminating material, court accepted the parties' mutual understanding that agreement incorporated such a promise).

Similarly, where a cooperation arrangement exists, but clearly limits the boundaries of immunity, courts are chary of expanding upon the parties' clear intentions. See United States v. Fontana, 50 F.3d 86, 87-88 (1st Cir. 1995) ("single, limited[ ] promise" of immunity for evidence of

amount of counterfeit money did not extend to information on cohort's identity); United States v. Stevens , 918 F.2d 1383, 1387 (8th Cir. 1990) (despite assertion that higher drug quantity could not be considered under cooperation agreement, defendant voluntarily stipulated to higher amount in superseding plea agreement).

Whether the government has violated a plea, or by analogy, a cooperation agreement, is a question of law subject to de novo review. United States v. Huang, 178 F.3d 184, 187 (3d Cir. 1999). Whether any such agreement exists is also a question of law with the underlying facts found by the District Court reviewed for clear error. ATACS Corp. v. Trans World Comm., Inc., 155 F.3d 659, 665 (3d Cir. 1998).

Although a cooperative plea agreement is not altogether the same as a commercial arrangement, civil contract law is nevertheless an important and useful aid in interpretation. Huang, 178 F.3d at 187–88 (citing United States v. Khan, 920 F.2d 1100, 1105 (2d Cir. 1990)); see also United States v. Nolan–Cooper, 155 F.3d 221, 236 (3d Cir. 1998) (plea agreements construed according to contract principles); United States v. Isaac, 141 F.3d 477, 483 (3d Cir. 1998); United States v. Moscahlaidis, 868 F.2d 1357, 1361 (3d Cir. 1989).

The government may not rely upon a rigid and literal construction of the terms of a plea or cooperation agreement. Nolan–Cooper, 155 F.3d at 236. Such agreements are unique and are to be construed in light of "special due process concerns." United States v. Bradbury, 189 F.3d 200, 206 (2d Cir. 1999) (internal quotes omitted). Courts must determine whether the government's conduct was inconsistent with what was reasonably understood by defendant when entering the plea of guilt. United States v. Badaracco, 954 F.2d 928, 939 (3d Cir. 1992); Bradbury, 189 F.3d at 206. In view of the government's tremendous bargaining power, we will strictly construe the text against it when it has drafted the agreement. United States v. Padilla, 186 F.3d 136, 140 (2d Cir. 1999).

As is apparent from the text of guideline section 1B1.8(a), there is a threshold inquiry of whether the government

10

promised to immunize the defendant's incriminating statements. We thus begin with the letter of December 9, 1994. As noted earlier, it states that "[f]rom now on, any statements, documents, tape recordings or other information which you may provide is on the record, and could be admitted against you in the future if you failed to plead guilty to the offenses" enumerated in the agreement.

That clause is the focal point of the dispute. Defendant reads it to mean that information garnered from his assistance could be used against him only if he failed to plead guilty to the offenses described in the letter. In his view, the phrase "if you failed to plead guilty" creates a condition precedent to the use of any incriminating information against him. The government, in contrast, takes the position that all information was "fully on the record," and that the now-disputed statement was merely a warning of the consequences of a failure to plead, and not a promise to immunize cooperation evidence upon entry of a guilty plea.

We reject the government's reading. Construing ambiguity against the government, we conclude the agreement states that if defendant did plead guilty, the information would not be used "against [him] in the future." We are persuaded that reasonable persons would understand the challenged clause to mean that incriminating information would not be admitted against defendant in any proceeding, including his own sentencing, if he pleaded guilty to the designated offenses.

Having determined that an agreement exists, we must next consider whether defendant breached it, and if so, whether it remained in force. After the letter was signed, defendant attempted to shield his fellow officer DeGovanni. Nevertheless, even while attempting to aid DeGovanni, defendant was simultaneously providing information to incriminate other members of the police force.

It seems clear that the effort to aid DeGovanni was at least a partial breach of that agreement and defendant does not appear to contend otherwise. Upon learning of the defendant's duplicity, the government might have declared a breach of the agreement and either attempted to sever its

11

relationship with defendant or to negotiate a new arrangement disavowing the earlier one. That, however, does not seem to have occurred. Instead, defendant agreed to plead to an additional count for obstruction of justice, but significantly, continued his cooperation.

The next important development is the execution of the formal plea agreement on March 30, 1995. Paragraph 2(j) of that document has particular relevance:

> Defendant agrees that if the government determines that the defendant . . . has committed any federal, state or local crime between the date of this agreement and his sentencing, . . . the agreement may be voided by the government and the defendant shall be subject to prosecution for any federal crime of which the government has knowledge including, but not limited to, perjury, obstruction of justice, and the substantive offenses arising from this investigation. This prosecution may be based upon any information provided by the defendant during the course of his cooperation, and this information may be used as evidence against him.

This provision means that if defendant engaged in criminal conduct after signing the plea agreement, the government could use any information supplied by defendant against him. By negative implication, as in the instance of the December 9 letter, the government agreed as a general matter not to use to the defendant's detriment information obtained through the cooperation process. Thus, the plea agreement was consistent with the December 9 letter of immunity.

We note that paragraph 4(d) of the plea agreement indicates that the government could "bring to the Court's attention all facts relevant to sentencing (including evidence relating to the character of the defendant)." This provision, of course, begs the question of what facts are "relevant" to sentencing. By agreeing to immunize self-incriminating information, the government has limited the scope of information that may be considered at sentencing. We therefore do not understand this provision to provide an end-run around the cooperation agreement.

12

Reading the formal plea agreement against the government as the drafter, and in light of its acceptance of the plea to obstruction of justice as an apparent cure of the initial breach, we conclude that the government treated the December 9 agreement as remaining in effect. That conclusion is not altered by the plea agreement's integration clause, which states that "no additional promises, agreements or conditions have been entered into other than those set forth in this document . . . ." This obvious boilerplate does not contain language purporting to supersede the December 9 letter. Further, the two documents may be read consistently with one another. In light of these considerations and the special due process concerns in the criminal arena, the integration clause has no effect in this context.

Having concluded that there has been a breach, an apparent cure, and a conceded continuation of the cooperation, we must determine whether the District Court was correct in declaring the agreement null and void. In contract law, the effect of a breach is a frequently litigated issue. The question is often whether the agreement is absolutely and automatically dissolved on the occurrence of an event, i.e., void, or whether one party's action gives the other the option to declare the agreement at an end, i.e., voidable.

As expressed by a recognized authority on contracts, "[u]ntil the party who has the power of avoidance elects to exercise it, the contract remains intact. Moreover, even though one of the parties has the power of avoidance, he may extinguish that power by ratification of the contract." John E. Murray, Jr., Murray on ContractsS 17, at 31 (3d ed. 1990). On the other hand, " `[v]oid' contracts are not contracts at all" and any promise therein is unenforceable. Id. at 32; see also Restatement of Contracts (Second) S 7 (1981); E. Allan Farnsworth, Contracts S 4.10, at 243–44 (3d ed. 1999); 1 Joseph M. Perillo, Corbin on Contracts SS 1.6– 1.7 (rev. ed. 1993).

Although the District Court characterized the plea agreement as "null," it is clear that if there was a contract, it would be voidable, not void. Moreover, in the criminal context, if a breach is to be remedied by a subsequent

13

agreement, the defendant should receive an adequate warning of the consequences. Bradbury, 189 F.3d at 208. Failure to provide adequate notice of a breach would undercut one of the " `most important advantages' " of section 1B1.8, that " `prosecutors can . . . assure potential informants that their statements will in no way be used against them.' " Id. at 208 (quoting Shorteeth, 887 F.2d at 257) (alteration in original). The record before us does not reveal any warning to defendant as to the consequences of his breach. Instead, the government continued to reap substantial benefits from his cooperation.

In sum, construing the documents against the drafter, we conclude that the government agreed not to use information defendant provided against himself at sentencing. The government accepted the defendant's guilty plea to obstruction of justice as a satisfaction of the breach and did not attempt to avoid the December 9 agreement. It further appears that the government's performance in continuing the cooperation arrangement without any warning to defendant that its former promise no longer applied constituted a waiver of the breach. Consequently, the District Court erred in ruling that the cooperation agreement was a nullity.

At this stage, defendant has laid the groundwork for a meritorious claim, but we caution that the record is not complete. Immunity does not extend to material known to the government before it entered into the cooperation agreement. U.S.S.G. S 1B1.8(b)(1); United States v. Wilson, 106 F.3d 1140, 1144 n.5 (3d Cir. 1997). Nor would it generally apply to disclosures made during the plea colloquy.

Also, information post-dating the agreement and obtained from independent sources is not barred. United States v. Gibson, 48 F.3d 876, 879 (5th Cir. 1995). Information separately gleaned from co-defendants is also fair game, United States v. Davis, 912 F.2d 1210, 1213 (10th Cir. 1990), and the defendant's later corroboration does not remove the co-defendant's evidence from consideration. United States v. Boyd, 901 F.2d 842, 845 (10th Cir. 1990). But the government may not evade U.S.S.G. S 1B1.8(a) where the evidence was elicited solely as a result of, or

14

prompted by, the defendant's cooperation. Davis , 912 F.2d at 1213; see also Gibson, 48 F.3d at 878.

The sources of the information utilized in the sentencing calculation in this case may only be resolved by a hearing on remand. Bradbury, 189 F.3d at 208; United States v. Amato, 46 F.3d 1255, 1262–63 (2d Cir. 1995); Kinsey, 917 F.2d at 184.

III.

We also note that the record is insufficient to establish whether the conduct of trial counsel satisfies Strickland's deficiency requirement, i.e., that the representation fell below the competence of attorneys in criminal cases. Strickland, 466 U.S. at 688. As one facet of this inquiry, we point out that under Burns v. United States, 501 U.S. 129, 138–39 (1991), a District Court must notify the parties in advance of sentencing if it intends to depart upwards on grounds not set out in the presentence report or the government's submission. United States v. Barr , 963 F.2d 641, 655 (3d Cir. 1992); see also United States v. Hecht, ___ F.3d ___, No. 99-1543, 2000 WL 637396, at *2 (3d Cir. Feb. 29, 2000). The record before us does not indicate whether such notice was given, or if it was required here.

Because the record contains no evidence on the reasons underlying counsel's decision not to challenge the presentence report or sentence on section 1B1.8 grounds, a hearing is required on that point as well.

Defendant has presented a prima facie claim of prejudice, but that too must be fleshed out on remand. Defendant must show that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. The determination of prejudice "should not depend on the idiosyncracies of the particular decisionmaker," and should instead "proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision." Id. at 695. Whether the defendant's prima facie claim can be rebutted by the government will have to be determined on remand.

15

Accordingly, the order of the District Court will be reversed and the case will be remanded for further proceedings consistent with this Opinion.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

16