**UNITED STATES of America**

**v.**

**Edgar Heberto LOPEZ, Defendant.**

**Criminal Nos. B–04–232, B–05–497.**

United States District Court,
S.D. Texas,
Brownsville Division.

March 23, 2009.

Oscar Ponce, Assistant United States Attorney, Brownsville, TX, for Plaintiff.

Hector Anthony Casas, Assistant Federal Public Defender, Brownsville, TX, for Defendant.

## MEMORANDUM OPINION AND ORDER

ANDREW S. HANEN, District Judge.

On June 1, 2004, Defendant Edgar Heberto Lopez pleaded guilty in the United States District Court for the Southern District of Texas, Brownsville Division to three counts of a five-count indictment alleging various drug-related offenses. (Doc. No. 74). Sentencing was finally scheduled for March 9, 2004, however the defendant, out on bond, failed to appear and escaped to Mexico. He was indicted in B–05–CR–497 for this failure to appear. A warrant was issued for his arrest, and on April 16, 2008, Defendant was recaptured. He then pleaded guilty to the failure to appear charge. At his sentencing hearing, Defendant offered a number of objections to the Presentence Investigation Report ("PSR"), and the Court ultimately took these issues under advisement and solicited briefs discussing the parties' arguments from both Defendant and the Government.

Having considered Defendant's objections, the briefs of both parties, and all applicable facts and law, the Court hereby enters the rulings presented herein.

### Offenses

Defendant has pleaded guilty to and is to be sentenced on the following charges

under cause numbers B:04–CR–232 and B:05–CR–497.

**Cause No. B:04–CR–232:**

**Count 1:** Conspiracy to Possess with Intent to Distribute a Quantity Exceeding 100 Kilograms of Marihuana and a Quantity Exceeding 5 Kilograms of Cocaine, in violation of 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(A), and 841(b)(1)(B).

**Count 2:** Possession with Intent to Distribute a Quantity Exceeding 100 Kilograms, that is, approximately 110 Kilograms, of Marihuana, in violation of 21 U.S.C. §§ 841(a)(1) 841(b)(1)(B), and 18 U.S.C. § 2.

**Count 5:** Using and Carrying a Firearm in Relation to Attempted Possession With Intent to Distribute Cocaine, that is, knowingly using and carrying a firearm during and in relation to a drug trafficking crime, namely attempted possession with intent to distribute cocaine, in violation of 18 U.S.C. §§ 924(c) and 2.

**Cause No. B:05–CR–497:**

**Count 1:** Bond Jumping—Failure to Appear as Required, in violation of 18 U.S.C. §§ 3146(a) and 3146(b)(1)(A)(i).

(Doc. No. 120 at 5, 6, 7)

### *Defendant's Objections to the PSR*

Defendant has offered the following objections to the PSR, which the Court now considers.

1. Defendant objects to the inclusion of certain evidence, calculations, and conclusions in the PSR because according to Defendant, the inclusion of such information is in violation of the letter and spirit of a proffer agreement entered into by the parties pursuant to United States Sentencing Guidelines § 1B1.8. (hereinafter, "the proffer agreement issue").

2. Regarding Count 1, the conspiracy count, Defendant contends that incidents embraced in this Count constitute three separate conspiracies and offers the following separate objections to Counts 1 and 3:

   a. Regarding the first conspiracy, undertaken February 3, 2003, and involving the theft of roughly 200 pounds of marihuana, Defendant contends that because his involvement in the conspiracy was "scant," these drugs should not be held against him as relevant conduct for purposes of sentencing (hereinafter, "the scant involvement issue").

   b. Regarding the third conspiracy, undertaken in March of 2004, and involving the impoundment of a car Defendant believed to contain six kilos of cocaine, Defendant contends that since the evidence shows that Defendant and the Government's informant were the only parties involved in the incident, there can be no conspiracy because an individual cannot conspire with the Government alone (hereinafter, "the cocaine conspiracy issue").

   c. Again regarding the third conspiracy, Defendant argues in the alternative that the Court should disregard the cocaine conspiracy because the Government impermissibly entrapped or manipulated the defendant into engaging in the attempted possession with intent to distribute cocaine (hereinafter, "the manipulation issue").

3. Regarding Count 5, the firearm offense, Defendant offers the following separate objections:

   a. The firearm conviction cannot be sustained because the Government has failed to produce sufficient evidence showing that Defendant

"used or carried a firearm" "during and in relation to" the attempted possession with intent to distribute cocaine (hereinafter, "the carrying a firearm issue").

b. Defendant objects to any sentence imposed in the firearm offense that is made to run consecutively to any sentence imposed in Counts 1 and 2 (hereinafter, "the greater minimum sentence issue").

No objections were made with respect to the escape charge.

### Discussion

The Court now addresses each of Defendant's objections in turn.

### I. The Proffer Agreement Issue

Defendant contends that the PSR contains information that was not known to the Government prior to Defendant's debriefing, and so to the extent that such information was provided by Defendant during this debriefing, its inclusion in the PSR and consideration for purposes of sentencing is precluded by a proffer agreement made between the Government and Defendant pursuant to United States Sentencing Guidelines § 1B1.8. (Doc. No. 135 at 1). This Guideline section provides in relevant part:

(a) Where a defendant agrees to cooperate with the government by providing information concerning unlawful activities of others, and as part of that cooperation agreement the government agrees that self-incriminating information provided pursuant to the agreement will not be used against the defendant, then such information shall not be used in determining the applicable guideline range, except to the extent provided in the agreement.

(b) The provisions of subsection (a) shall not be applied to restrict the use of information:

(1) known to the government prior to entering into the cooperation agreement

The actual proffer agreement entered into by the Government and Defendant provides in relevant part:

First, no statements made or other information provided by [Defendant] during the proffer will be used directly against [Defendant] in any criminal case, including sentencing in [Defendant's] case, except as outlined in *Sentencing Guidelines* § 1B1.8(b).

Second, the United States may make derivative use of and may pursue any investigative leads suggested by any statements or other information provided by [Defendant].

Defendant specifically emphasizes recitations in paragraphs 39, 40, and 41 of the PSR that contain the phrases "Edgar Heberto Lopez told agents . . .", "Lopez told agents that he and Valdez assisted Guzman steal $64,000 in narcotics proceeds", "Lopez said he created false seizures for Guzman . . .", "Lopez said Valdez paid him . . .", and "Lopez disclosed. . . ." Defendant also cites paragraph 42, which states "Abelardo Cerecer Valdez corroborated statements provided by Lopez." (Doc. No. 135 at 6). According to the defendant, inclusion of this information in the PSR violates both the letter and spirit of the proffer agreement. (*See id.* at 2).

The Government maintains that the PSR "accesses relevant conduct based on the information as obtained by co-defendant, Valdez." (Doc. No. 136 at 3). The Government essentially argues that although the information at issue in this objection was first obtained by the Government during Defendant's debriefing, this information was subsequently corroborat-

ed by co-defendant Valdez during his later debriefing. This later debriefing therefore constitutes an independent source of the information, obtained through "derivative use" of Defendant's initial statement, and so its use in the PSR is consistent with both Guidelines section 1B1.8(b) ("such information shall not be used in determining the applicable guideline range ... except to the extent provided in the agreement") and the proffer agreement ("the United States may make derivative use of and may pursue any investigative leads suggested by any statements or other information provided by [Defendant]").

The issue for this Court to decide is whether, in light of § 1B1.8(b) of the Guidelines and the actual proffer agreement, information initially disclosed to the Government by Defendant during his debriefing and then corroborated by a co-defendant at a later interview may be included in the PSR and considered as relevant conduct for the purposes of sentencing.

■ As a preliminary matter, it is worth noting some general guidelines for the interpretation of cooperation agreements in general and the application of Guidelines § 1B1.8(b) in particular. Courts typically interpret plea and cooperation agreements in terms of contract principles. See, e.g., United States v. Baird, 218 F.3d 221, 229 (3d Cir.2000); United States v. Khan, 920 F.2d 1100, 1105 (2d Cir.1990). Nonetheless, the "government may not rely upon a rigid and literal construction of the terms of a plea or cooperation agreement." Baird, 218 F.3d at 229. Further, such agreements are "unique and are to be construed in light of 'special due process concerns.'" Id. (quoting United States v. Bradbury, 189 F.3d 200, 206 (2d Cir.1999)). Courts must determine whether the Government's conduct was inconsistent with what was reasonably understood by the defendant when entering into such agreements. Id. Finally, in view of the Government's tremendous bargaining power, courts should strictly construe the text against the Government when it has drafted the agreement. Id.; United States v. Padilla, 186 F.3d 136, 140 (2d Cir.1999).

Courts have applied similar principles when interpreting the "except to the extent provided in the agreement" language of § 1B1.8. In United States v. Shorteeth, the Tenth Circuit considered whether it was proper for the district court to have considered during sentencing information disclosed by the defendant pursuant to the terms of a plea agreement that promised not to prosecute the defendant for any crimes she might reveal through her cooperation. 887 F.2d 253 (10th Cir.1989). The plea agreement also provided that "[t]here are no agreements whatsoever regarding what sentence your client will or should receive. Sentencing will remain in the sole discretion of the trial court." Id. at 254 n. 2. The Court considered whether this language triggered the "except to the extent provided in the agreement" clause of Guidelines § 1B1.8, thereby justifying the district court's consideration at sentencing of information revealed by the defendant pursuant to this agreement. After first invoking the principles of interpretation discussed above, the Court emphasized that it "cannot condone the Government accomplishing through indirect means what it promised not to do directly." Id. at 256.

Applying these principles to the plea agreement, the Tenth Circuit held that despite the agreement's language explicitly separating sentencing from the compass of its promise not to prosecute the defendant for crimes revealed during the defendant's cooperation, this language nonetheless failed to trigger the exception clause of § 1B1.8:

[W]e believe the language and spirit of Guidelines § 1B1.8 require the agreement to specifically mention the court's ability to consider defendant's disclosures during debriefing in calculating the appropriate sentencing range before the court may do so. This is the most reasonable construction of the "except to the extent" language of § 1B1.8 and the commentary. It would also seem to promote the purposes of plea agreements requiring defendants' cooperation with law enforcement authorities.

*   *   *

One of § 1B1.8's most important advantages is that prosecutors can now assure potential informants that their statements will in no way be used against them. This advantage will be undercut if we allow ambush by broadly worded disclaimers.... The full disclosure approach we require here will ensure defendants are not unfairly surprised by sentencing determinations and will allow both the defendant and the government to bargain with full information.

*Id.* at 257. This suggests the seriousness courts attach to the due process considerations implicit in these contexts.

█ We now turn to consideration of cases involving, as here, the use for purposes of sentencing of a *co-defendant's* statement against the defendant in the context of an agreement not to use information provided by *defendant* against the defendant. The Government cites two cases for its contention that a "plea agreement is not violated by the use of statements of a co-defendant." (Doc. No. 136 at 3). The first is a case from the Tenth Circuit in which the Court considered a defendant's claim that the terms of his plea agreement were violated when the district judge considered during sentencing information provided by the co-defendants because, according to the defendant, the codefendants merely "corroborated" information initially provided by the defendant pursuant to his plea agreement. *United States v. St. Julian,* 922 F.2d 563, 566 (10th Cir.1990). The Court rejected this argument, noting that "there is no indication that the co-defendants' statements were elicited as a result of [Defendant's] plea agreement with the government, and [Defendant] provided no evidence that, had he refused to cooperate, his co-defendants likewise would not have offered th[is] information...." *Id.*

The Court finds this case inapposite because the factual issues decisive to the *St. Julian* Court's holding are crucially different from those in the instant case. At the sentencing hearing of March 2, 2009, it became clear that there is a general consensus among the attorneys and the parties that the information obtained from Defendant during his debriefing was used to elicit co-defendant Valdez's corroborating statements. Indeed, it is precisely this scenario that other courts have held violates the terms of an agreement like the one in this case. *See Baird,* 218 F.3d at 231 ("[T]he government may not evade U.S.S.G. § 1B1.8(a) where the evidence was elicited solely as a result of, or prompted by, the defendant's cooperation." (citing *United States v. Davis,* 912 F.2d 1210, 1213 (10th Cir.1990)), which is the case upon which the *St. Julian* Court relied for the holding just discussed, and *United States v. Gibson,* 48 F.3d 876, 879 (5th Cir.1995), discussed *infra*).

The second case the Government cites is *United States v. Gibson,* in which the Fifth Circuit rejected the defendant's argument that the district court's consideration during sentencing of information provided during the defendant's debriefing violated the terms of his proffer agreement. 48 F.3d 876, 879 (5th Cir.1995). This case inapposite, as well. Again, the Court's

explanation of its holding distinguishes that case from the instant case:

> [B]ecause the probation officer unequivocally testified that none of the drug-quantity information obtained from [Defendant] during [his] debriefing or in the first presentence interview was used to determine his offense level, **and that it was [Defendant] who subsequently corroborated his co-defendants' accounts** of the drugs transported during the earlier trips, the district court's determination that § 1B1.8 was not violated will not be disturbed.

*Id.* (emphasis added). In the instant case, it is undisputed that the information to which Defendant objects was first provided to the Government during his debriefing and that this information was then merely corroborated at co-defendant Valdez's debriefing. No suggestion has been made that Defendant's information was "vague", "ambiguous", or "extreme", as was the case in *Gibson*, such that as a result, "what the defendant finally [provided in his last interview] was merely a confirmation of what his two codefendants had already provided." *Id.* at 878. For these reasons, *Gibson* does not apply to the facts of this case.

The Government also emphasizes that the proffer agreement specifically allows the Government to "make derivative use of" and "pursue any investigative leads suggested by any new statements … provided by [Defendant]" and that this Court has sustained the Government's reliance on this language in a myriad of cases. (Doc. No. 136 at 4). This language, the Government contends, falls squarely into the exception clause of § 1B1.8. The Court has found one unpublished case from the Fifth Circuit that arguably supports the Government's argument. In *United States v. Keck*, a panel considered whether the inclusion in the PSR of certain drug amounts provided by the defendant and later corroborated by co-defendants violated a proffer agreement containing language very similar to the instant agreement. 3 F.3d 437, No. 92–4957, 1993 WL 347004 (5th Cir. Aug. 12, 1993) (not selected for publication). In *Keck*, the defendant had admitted in his debriefing that he had delivered roughly 300 pounds of marihuana over 15 separate trips. *Id.* at *7. The co-defendants corroborated 120 pounds of these deliveries. *Id.* The Court concluded that the portion of the proffer agreement providing, as here, that the Government may make "derivative use of" and "pursue any investigative leads suggested by the statements made or information provided during the proffer" permitted the use of the drug amounts provided by the defendant, but only up to the amount corroborated:

> The proffer agreement specifically reserves to the government the right to follow investigative leads suggested by [Defendant's] statement. It was, therefore, well within the parameters of that agreement to discuss the alleged transactions with [the co-defendant, whose statement] partially corroborates [Defendant's] statement, but not as to the larger amount. Therefore, it would have been appropriate for the PSR to include these transactions as relevant conduct, but the amount would be 120, rather than 300, pounds.

*Id.*

Crucially, however, the *Keck* Court does not include in its discussion facts detailing how exactly the information provided by the defendant was used to elicit the corroborative statement by his co-defendant. Further, the *Keck* Court indicated that the district court's use of this information might constitute error, but concluded it was harmless because it did not affect the sentence. *Id.* Ultimately, the specific facts

surrounding the use made by the Government of the information provided by Defendant must be at the heart of any attempt to determine whether that use was sufficiently "derivative" or the product of sufficient investigation to constitute something other than the direct use of such information precluded by the proffer agreement's promise that no "information provided by [Defendant] during the proffer will be used directly against [Defendant] in any criminal case, including sentencing in [Defendant's] case."

Put another way, many kinds of uses of information will inevitably fall somewhere along a continuum between that which is clearly a direct use (e.g., using the defendant's statement, and only that statement, as evidence against him) and that which is clearly a derivative use (e.g., pursuing leads suggested by defendant's testimony to discover evidence of wholly new · and unrelated crimes and using that evidence against him). For the proffer agreement's promise to foreswear direct use of information against the defendant to have any substance, or for that matter for it to make sense contractually, there must be other kinds of direct use beyond merely using the defendant's own words against him. Certainly that would be the view of any reasonable defendant. The only scenario that entails more direct use than in the instant case would be if Defendant's sentence were to be enhanced solely on the basis of his own statement. The fact that Defendant's statement was later simply confirmed by co-defendant Valdez (with a slight monetary discrepancy) suggests direct use far more than it does derivative use. If direct use is limited solely to the use of the defendant's own words against him, the Government should rewrite its proffer agreement to make that clear, because what the Government is effectively arguing here with regard to the agreement as it is presently constituted is that "no

information provided by the defendant during the proffer will be used against the defendant unless that information can be confirmed by any other person or evidence" or "no statement made will be directly used against you unless confirmed by another person or evidence." Absent such a limited meaning, the issue turns on the determination of whether the Government's use of the information provided by Defendant was more like "direct" use or "derivative" use. This inevitably will be an fact-intensive inquiry.

As discussed above, there is a general consensus among the parties and counsel in the instant case that the information obtained from Defendant during his debriefing was used to elicit co-defendant Valdez's corroborating statements. If the Government simply repeated Defendant's admissions to co-defendant Valdez and asked him if he agreed, as seems to have been the case, then this would, in the Court's view, be direct use rather than derivative use. The Government has the burden of showing that information provided by a defendant pursuant to a proffer agreement that is then used against that defendant was provided by other sources independent of the information provided by the defendant. *United States v. Taylor*, 277 F.3d 721, 724–26 (5th Cir.2001). The Government in this case has failed to provide any evidence indicating that the use made of the information provided by Defendant was sufficiently indirect to constitute "derivative" or "investigative" use rather than the direct use precluded by the proffer agreement. In light of the "special due process concerns" implicated by proffer agreements, the Court cannot uphold the use of this information against Defendant in this case. For these reasons, the Court grants Defendant's objection.

## II. The Scant Involvement Issue

Defendant contends that Count 1 of the indictment, charging conspiracy to possess

with intent to distribute marihuana and cocaine, embraces three distinct conspiracies. (Doc. No. 135 at 11). The first of these concerns an incident involving a Cadillac Escalade, which Defendant and another officer agreed to stop and have towed for the purposes of stealing the roughly 200 pounds of marihuana contained within. Defendant maintains that because of Defendant's "scant involvement in [this conspiracy], then perhaps those drugs should not be held against him." (*Id.* at 13).

■ Defendant does not deny that (1) he was recruited by another police officer to cooperate in a conspiracy to "rip-off" between 200 and 300 pounds of marihuana located in a Cadillac Escalade, and that Defendant agreed to cooperate; (2) Defendant followed the other officer in his own police vehicle at least part of the way to the Escalade with the intention of projecting the image of a legitimate stop; and (3) Defendant accepted $1,000 after the fact from the officer for his participation in this conspiracy. (*See* PSR at 7–8; Doc. No. 135 at 11). These facts are sufficient to sustain a conviction for conspiracy under 21 U.S.C. § 846. *See United States v. Lewis*, 476 F.3d 369, 383 (5th Cir.2007). Defendant's objection is therefore denied.

### III. The Cocaine Conspiracy Issue

Defendant contends that the Court should not consider the alleged cocaine conspiracy as relevant conduct because the undisputed evidence shows that the only

parties involved in this incident were Defendant and the Government's informant. (Doc. No. 135 at 12).

■ "In order to prove the existence of a drug conspiracy, the evidence must show beyond a reasonable doubt that two or more non-governmental persons agreed to commit the alleged offense." *United States v. Goff*, 847 F.2d 149, 173 (5th Cir. 1988). "A government agent or informer cannot be a co-conspirator." *Id.* In this case, it is undisputed that the only parties involved in the March 2004 conspiracy to possess with the intent to distribute six kilos of cocaine were Defendant and the Government's informant. (*See* PSR at 10). Accordingly, the Court will not consider the cocaine conspiracy in formulating its sentence, and Defendant's objection is granted.

### IV. The Manipulation Issue

■ Defendant contends that the Court should disregard the cocaine conspiracy because the Government impermissibly entrapped or manipulated the defendant into engaging in the attempted possession with intent to distribute cocaine. (Doc. No. 135 at 1213). Since the Court has already determined that under applicable law, Defendant did not in fact conspire to possess cocaine, this objection is denied as being moot.[1]

---

1. In the context of this objection, Defendant emphasizes that the cocaine in question never actually existed and that its alleged presence in the vehicle was a ruse by the Government's informant to induce the defendant into yet another conspiracy. (*See* Doc. No. 135 at Attachment 2). The Court uses this occasion, for the purposes of thoroughness to note that the nonexistence of the cocaine in question does not preclude a conviction for conspiracy, *see United States v. Burke*, 431 F.3d 883, 886 (5th Cir.2005), or for an attempt to possess with intent to distribute cocaine, *see United States v. Partida*, 385 F.3d 546, 560–61 (5th Cir.2004), as was alleged in count four of the indictment. Since the attempt to possess with intent to distribute cause is a valid charge, the predicate "drug-trafficking offense" on which the section 924(c) violation is based remains valid. *See United States v. Ramos*, 136 F.3d 465, 467 (5th Cir.1998) ("It is the fact of the offense, and not a conviction, that is needed to establish the required predicate.") (internal quotations omitted).

## V. The Carrying a Firearm Issue

■ Defendant pleaded guilty to Count 5 of the indictment, which charges that

Edgar Heberto Lopez, during and in relation to a drug trafficking crime, namely, attempted possession with intent to distribute cocaine, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A), 846 and Title 18, United States Code, Section 2, did knowingly use and carry a firearm, that is, his service handgun, in violation of Title 18, United States Code, Sections 924(c) and 2.

Defendant contends that the Court should not sustain the firearm conviction because the Government has failed to produce evidence sufficient to show that Defendant "did knowingly use or [2] carry a firearm" "during and in relation to" the attempt to possess with the intent to distribute cocaine. Defendant notes that according to the plea papers and the Government's factual summary, although Defendant was carrying his service firearm (presumably meaning on his belt) when he engaged in the activities surrounding the impoundment of the vehicle he believed contained cocaine, there is no evidence that he did anything more with the weapon. (*See* Doc. No. 135 at Attachment 1). Merely carrying a service firearm as an incidental aspect of wearing the police officer's uniform is, according to Defendant, insufficient to constitute a using or carrying in relation to a drug trafficking offense for the purposes of 18 U.S.C. § 924(c). (*Id.*).

There is no dispute that Defendant was "carrying" his weapon, which satisfies § 924(c). *See United States v. Villafane–Jimenez*, 410 F.3d 74, 83 n. 8 (1st Cir. 2005). Defendant's argument is directed at the "nexus requirement" of the statute,

i.e., that the firearm is possessed "during and in relation" to a drug trafficking crime. The First Circuit has ably explained the application of the nexus requirement to the specific facts of a case similar to this one in important respects. *See id.* To show such a nexus, "the government must illustrate through specific facts, which tie the defendant to the firearm, that the firearm was possessed to advance or promote the criminal activity." *United States v. Grace,* 367 F.3d 29, 35 (1st Cir. 2004) (quoting *United States v. Lawrence,* 308 F.3d 623, 630 (6th Cir.2002)). In *United States v. Villafane–Jimenez*, the First Circuit applied this standard to two police officers who in the course of escorting the transport of drugs never drew their service firearms. 410 F.3d at 83. The Court emphasized that "the brandishing or use of firearms is not a necessary element of" a section 924(c) offense. *Id.*; *see also United States v. Guidry,* 456 F.3d 493, 507–08 (5th Cir.2006). Instead, the Court emphasized the implicit role the carrying of a service firearm by a police officer plays in the execution of a drug trafficking offense:

The evidence supports the conclusion that the sole and mutually understood purpose of Defendants' participation in the activity as law officers was to prevent, by their presence, other drug dealers or other legitimately motivated police officers from interfering in and disrupting the transport of drugs. It is obvious that the presence of guns, displayed in the open, by the Defendants as active participants in the illegal activity, would have a tendency to discourage interruption of the transport by other persons and was intended by the Defendants to do so. Further, it could be fairly inferred by the jury that po-

---

**2.** Defendant does not dispute that the statute is disjunctive on this point.

tential intervenors would likely also bear arms and that the presence of Defendants' firearms would disabuse any potential intervenor of any thought that he would enjoy a superiority of force in intervening in the situation. The possession of the firearms did, as intended by the Defendants, "further" the illegal drug trafficking activities.

*Id.* This analysis applies to the instant case, as well. Defendant arrived at the scene of the "abandoned" vehicle driving his police car and wearing his police uniform, including his service revolver. Lopez was on duty and then called to have the car that he assumed contained cocaine towed to a location where the cocaine would be retrieved and he would be paid $10,000. The entire impoundment of the vehicle, which Defendant assumed contained cocaine, was executed in his capacity as a police officer. For all the reasons discussed by the *Villafane–Jimenez* Court, the Court finds that Defendant's possession of his firearm did in fact "further" his attempted possession with intent to distribute cocaine. Moreover, such a finding comports with the Fifth Circuit's broad reading of the nexus requirement, as well. *See Guidry,* 456 F.3d at 507–08 (5th Cir. 2006) (finding that evidence showing that a police officer who carried his service firearm on his belt during the commission of a rape was sufficient to satisfy the nexus requirement of section 924(c) even though he never removed the gun from his belt or threatened his victim with it). The objection in this respect is overruled.

## VI. The Greater Minimum Sentence Issue

Defendant objects to any sentence imposed in the firearm offense that is made to run consecutively to the sentence imposed for Counts 1 and 2 of the original indictment. (Doc. No. 135 at 8). In support, Defendant points to the wording of the statute on which the firearm offense is based, 18 U.S.C. § 924(c)(1)(a), which provides that any person using and carrying a firearm during and in relation to a drug trafficking crime shall, in addition to the punishment imposed for the drug trafficking crime, be sentenced to a minimum of five years imprisonment, "**[e]xcept to the extent that a greater minimum sentence is otherwise provided by this subsection or by any other provision of law**" (emphasis added). The defendant contends, since Defendant is subject to a sentence greater than five years as a consequence of the cocaine component in his conviction upon Count 1, "the five year consecutive sentence otherwise required by 18 U.S.C. § 924(c)(1)(A) is inapplicable." (Doc. No. 135 at 8). The Government opposes this interpretation and has an abundance of authority to support its position. (*See* Doc. No. 136 at 7–8). Nevertheless, the Court need not resolve the issue due to its prior decision involving the cocaine conspiracy.

Defendant would indeed be subject to a minimum sentence greater than five years on Count 1, but only if that Count includes the conspiracy to possess with intent to distribute cocaine. Since the Court has granted Defendant's prior objection and removed the cocaine-related activity from its consideration of Count 1, the penalties resulting from that count must be calculated with respect to the marihuana conspiracies only. Converting into kilograms, the weight of the marihuana from the Escalade incident was 90.72 kilograms. The weight of the marihuana from the second conspiracy event (February 2004) was 50 pounds, or 22.68 kilos. Combined, these amounts exceed 100 kilograms. Under 21 U.S.C. §§ 841(b)(1)(A) and (b)(1)(B), the

minimum sentence for conspiracy to possess with intent to distribute between 100 and less than 1,000 kilograms of marijuana "may not be less than 5 years."[3] Defendant is thus subject under Count 1 to a mandatory minimum sentence of "not less than five years." Since Defendant is no longer subject to a minimum sentence of greater than five (5) years under Count 1, the statutory exception, as interpreted by Defendant, built into 18 U.S.C. § 924(c)(1)(A) moots Defendant's interpretation. Since the amount of marihuana in Count 2 is also between 100 and 1,000 kilograms, i.e., approximately 110 kilograms, the same holds true for Count 2. Accordingly, the sentence for the firearm offense should be consecutive to the sentence imposed under Counts 1 and 2. Defendant's objection on this ground is therefore denied.

For these reasons stated above, the Court GRANTS Defendant's objection based upon the proffer agreement and the objection regarding the existence of a cocaine conspiracy, and DENIES the remaining objections.

---

3. According to the PSR, there is an additional 50 pounds (or 22.68 kilograms) of marihuana that should be counted as relevant conduct. Defendant at one point suggested that this was duplicative of the load mentioned above. For sentencing purposes, this argument is really not germane because the Guideline range and the statutory penalties are the same for 113.4 kilograms or for 136.08 kilograms of marihuana. Under no scenario considering the various marihuana conspiracies attributed to Defendant in the PSR does the total weight of the drug equal or exceed 1,000 kilograms.